# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| DIANA DOE, by and through her parent and next friend David Doe, NATHAN NOE, by and through his parent and next friend Nicole Noe, and PARKER POE,<br><br>*Plaintiffs*.<br><br>v.<br><br>DEPARTMENT OF DEFENSE; PETE HEGSETH, in his official capacity as Secretary of Defense; ANTHONY J. TATA, in his official capacity as the Under Secretary of Defense for Personnel and Readiness; STEPHEN L. FERRARA, in his official capacity as Acting Assistant Secretary of Defense for Health Affairs; DEFENSE HEALTH AGENCY, and DAVID J. SMITH, in his official capacity as Acting Director of the Defense Health Agency,<br><br>*Defendants*. | Civil Action No. 8:25-cv-2947<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

* Plaintiffs have filed a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs Nathan Noe, Nicole Noe, Diana Doe, David Doe, and Parker Poe to proceed under pseudonyms.

## INTRODUCTION

1.      For nearly a decade, servicemembers of our Armed Forces have relied on the military health system and the TRICARE[1] program to obtain medically necessary medications for their transgender adolescent and adult children. Then, following an executive order issued by the President in January 2025 as part of a broad effort to strip equal rights from transgender people, the Department of Defense ("DoD") and the Defense Health Agency ("DHA") suddenly reversed course, adopting a categorical exclusion of this essential medical care from TRICARE coverage and banning military hospitals and clinics from providing this care. As a result, Plaintiffs and other transgender adolescents and young adults across the country were abruptly cut off from their treating providers, putting them at risk of losing access to healthcare they need. The new TRICARE policies also require them to pay for care out-of-pocket in the future, which is a significant expense and, for some, a potentially insurmountable financial burden.

2.      TRICARE's sudden refusal to cover medically necessary care has inflicted profound harm on Plaintiffs. Their prescriptions have been cut off without notice. Their trusted doctors at military hospitals have been forced to abandon them. Plaintiffs' families now face significant, and in some cases crushing, out-of-pocket costs or the prospect of watching their family member's health deteriorate without the medications that kept them healthy and stable. This is not an abstract policy shift—it is an immediate and devastating disruption of essential healthcare that affects the physical and psychological wellbeing of Plaintiffs and other young people throughout the country.

---

[1] "TRICARE" refers to the Department of Defense's healthcare program that provides insurance coverage to millions of current and former military servicemembers and their families.

3.      Defendants' sweeping restrictions on all gender transition medications for both minors and legal adults were imposed without statutory authority, without the notice-and-comment procedures required by the Administrative Procedure Act, and without providing TRICARE beneficiaries the notice that federal law mandates before benefits are reduced. In short, Defendants have exceeded their authority, disregarded statutory limits set by Congress, and upended the separation of powers.

4.      Plaintiffs bring this action under the Administrative Procedure Act to set aside DoD and DHA's new rules prohibiting gender transition care from being covered by TRICARE or provided at military hospitals and clinics because those rules were issued without observance of procedure required by law and are arbitrary, capricious, and in excess of statutory authority. This action also seeks to enjoin Defendants from implementing President Trump's executive order directing agencies to eliminate federal funding for transgender healthcare for people under the age of 19 and instructing DoD and DHA to ban TRICARE coverage for that care.

## JURISDICTION AND VENUE

5.      This action arises under the Constitution of the United States and the Administrative Procedure Act, 5 U.S.C. §§ 701–06.

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

7.      This Court has jurisdiction to review agency actions under 5 U.S.C. § 702.

8.      This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief under 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 65, and this Court's inherent equitable powers.

9.      This Court has authority to hold unlawful and set aside agency action, findings, and conclusions under 5 U.S.C. § 706.

10.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district. In addition, venue is proper under 28 U.S.C. § 1391(e)(1)(B) and (C) because defendants are agencies of the United States and officers of the United States sued in their official capacity; one or more plaintiffs reside in this district; and a substantial part of the events giving rise to this action occurred and continue to occur in this district.

## PARTIES

11.     Plaintiff David Doe is the parent and next friend of Diana Doe, a ▮▮▮▮▮▮▮▮ transgender girl. Because of concerns about his child's safety and privacy, Mr. Doe and Diana are proceeding pseudonymously. Mr. Doe and Diana reside in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

12.     Plaintiff Nicole Noe is the parent and next friend of Nathan Noe, a ▮▮▮▮▮▮ transgender boy. Because of concerns about her child's safety and privacy, Ms. Noe and Nathan are proceeding pseudonymously. Ms. Noe and Nathan reside in ▮▮▮▮.

13.     Plaintiff Parker Poe is an ▮▮▮▮▮▮ transgender man. Because of concerns about his safety and privacy, he is proceeding anonymously. Parker is domiciled in ▮▮▮.

14.     Defendant DoD is an agency of the United States government that, among other responsibilities, manages the needs of servicemembers and their families and oversees the military health system.

15.     Defendant Pete Hegseth is sued in his official capacity as the Secretary of Defense to the United States. The Secretary maintains authority, direction, and control over DoD. The Secretary is authorized to establish DoD policies, including by promulgating DoD Directives and Instructions that interpret and implement federal law. The Secretary is responsible for administering the TRICARE program, which provides worldwide medical, dental, and pharmacy programs to uniformed servicemembers, retirees, and their families. The Secretary is also

responsible for maintaining military medical treatment facilities ("MTFs"), where many TRICARE beneficiaries, including Plaintiffs, receive care.

16.     Defendant Anthony J. Tata is sued in his official capacity as Under Secretary of Defense for Personnel and Readiness. The Under Secretary is the principal staff assistant and advisor to the Secretary of Defense concerning health affairs. He is responsible for developing policies, plans, and programs for health and medical affairs, including the provision of health services to dependents of servicemembers through the TRICARE program and the operation of MTFs.

17.     Defendant Stephen L. Ferrara is sued in his official capacity as the Acting Assistant Secretary of Defense for Health Affairs. The Assistant Secretary is the principal advisor to the Secretary of Defense and the Under Secretary of Defense for Personnel and Readiness for all DoD health policies, programs, and activities. He is responsible for providing and maintaining readiness for medical services to servicemembers, their families, and other TRICARE beneficiaries. In carrying out those responsibilities, the Assistant Secretary exercises authority, direction, and control over DoD medical policy, facilities, programs, and funding.

18.     Defendant Defense Health Agency ("DHA") is an agency within DoD that manages both the TRICARE program and MTFs.

19.     Defendant David J. Smith is sued in his official capacity as the Acting Director of the DHA. The Director reports to the Assistant Secretary of Defense for Health Affairs. The Director oversees the TRICARE program and is responsible for the administration of all MTFs.

## FACTS

### I.    Gender dysphoria is a serious medical condition.

20.     Gender dysphoria is a serious medical condition marked by the significant distress or impairment that occurs when a transgender individual is unable to transition and to live in a sex

different than their birth sex. The condition is treatable. When left untreated, however, it causes serious physical and psychological harms.

21.     The current, medically accepted treatment for gender dysphoria is to enable a transgender person to live in the sex different than their birth sex. This care is often referred to as "gender transition," and it is a highly effective treatment for gender dysphoria.

22.     The medical and scientific community recognize well-established protocols for treating gender dysphoria and for gender transition. These protocols are endorsed by the major medical and mental health associations in the United States, including but not limited to the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the American Association of Child and Adolescent Psychiatrists, the Endocrine Society, and the Pediatric Endocrine Society.

23.     The treatment for gender dysphoria for any particular patient depends on an individualized assessment of the patient's health condition and medical needs.

24.     For transgender children experiencing gender dysphoria before the onset of puberty, the only recommended intervention is social transition. For transgender boys, this means living as a boy; for transgender girls, it means living as a girl. Social transition may include adopting a different name, pronouns, hairstyle, or clothing.

25.     Transgender adolescents often experience worsening gender dysphoria as they begin to experience irreversible physical changes associated with puberty. Puberty-blocking medication may become medically necessary after a transgender adolescent initiates puberty to minimize or prevent the exacerbation of gender dysphoria that ongoing puberty would cause.

26.     For older transgender adolescents and young adults, hormone therapy may also be medically necessary to alleviate their gender dysphoria and facilitate gender transition.

27.     Under accepted protocols, physicians do not prescribe puberty-blocking medications or hormones to adolescent minors unless they have obtained informed consent from a parent and assent from the minor. Physicians must disclose the known risks and benefits of each medication to obtain informed parental consent and minor assent.

28.     Evidence shows gender transition treatments are safe and effective for transgender adolescents and adults. For example, longitudinal studies have shown that transgender adolescents with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with those of non-transgender young people. In addition, decades of research shows that gender transition treatments are highly effective for adults. By contrast, transgender adolescents and adults with gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.

## II.     **For nearly a decade, TRICARE covered medically necessary gender transition medications for transgender adolescents and young adults.**

29.     Consistent with this scientific evidence and accepted medical standards, TRICARE has covered puberty-blocking medications and hormone therapy when indicated for transgender adolescents, and hormone therapy when indicated for transgender adults, for nearly a decade.

30.     For the last several years, dependents of active duty servicemembers and other TRICARE beneficiaries have been able to obtain medically necessary gender transition medications from MTFs and could fill their corresponding prescriptions through military pharmacies.

31.     Prior to June 11, 2025, the TRICARE policy manual indicated that coverage was available for this medically necessary care. That manual provided:

Gender-affirming hormone therapy, also known as cross-sex hormone treatment, is covered for adult or adolescent beneficiaries when all of the following criteria are met:

• The beneficiary meets the eligibility criteria outlined in the most current version of the Endocrine Society Clinical Practice Guidelines for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons.

• The beneficiary has no contraindications to gender-affirming hormone therapy.

**Note**: Endocrine treatment includes pubertal suppression.

TRICARE Policy Manual 6010.63-M, Ch. 7, § 1.3 (Dec. 2022) (revised June 4, 2025); *see id.* § 1.2 (similar). Attached as **Exhibit A** and incorporated by reference into this complaint is a true and correct copy of the versions of Sections 1.2 and 1.3 of Chapter 7 of the TRICARE Policy Manual that were in place prior to June 11, 2025.

### III. As part of a targeted reversal of legal equality for transgender people, the President ordered DoD to terminate TRICARE coverage for gender transition medications.

32. For years, the President has expressed hostile views toward transgender people.

33. During his 2024 presidential campaign, Donald Trump pledged a "day one" executive order to "cease all programs that promote the concept of sex and gender transition at any age."[2]

---

[2] President Trump's Plan to Protect Children from Left-Wing Gender Insanity, Trump Vance: Make America Great Again! 2025 (Feb. 1, 2023), https://www.donaldjtrump.com/agenda47/president-trumps-plan-to-protect-children-from-leftwing-gender-insanity.

34.     Throughout the campaign, he used derogatory language to describe transgender Americans, calling them "deranged,"[3] and referring to transgender identity as "madness"[4] and "insanity."[5] He falsely claimed transgender identity was "never heard of in all of human history."[6]

35.     President Trump's campaign spent approximately $215 million on advertisements targeting transgender Americans and promoting anti-transgender policies.[7] These advertisements comprised over 40 percent of his campaign messaging in the weeks before the 2024 election.[8]

36.     President Trump's campaign platform included a "Plan to Protect Children from Left-Wing Gender Insanity," which promised to deny legal recognition to transgender people and restrict access to medically necessary healthcare.[9]

---

[3] Gabriel Bertrand, *Trump's Shocking Admission Exposes GOP's Bigoted Agenda*, Medium (June 17, 2023), https://medium.com/illumination/trumps-shocking-admission-exposes-gop-sbigoted-agenda-e981becb2c5f.

[4] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, *supra* note 2.

[5] Jackson Walker, *Trump vows to remove 'transgender insanity' and critical race theory from US schools*, IdahoNews (Dec. 23, 2024, 8:37AM), https://idahonews.com/news/nation-world/trump-vows-to-remove-transgender-insanity-and-critical-race-theory-from-us-schools-phoeniz-arizona-woke-speech-usa-donald-president-white-house-education-department-crt-trans-gender-lgbt; *Trump and Vance make anti-transgender attacks central to their campaign's closing argument*, NBC News (Nov. 1, 2024, 10:23 AM), https://www.nbcnews.com/nbcout/out-politics-and-policy/donald-trump-jd-vance-transgender-2024-election-rcna178390; Donald J. Trump, Truth Social (Dec. 18, 2023), https://truthsocial.com/@realDonaldTrump/posts/111599880929254153; Gabriel Bertrand, *supra* note 3; Joe Middleton, *Trump attacks transgender rights at Waco rally saying he will ban 'disfigurement of our youth'*, The Independent (Mar. 26, 2023), https://www.independent.co.uk/news/world/americas/donald-trump-transgender-waco-rallyb2308177.html.

[6] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, *supra* note 2.

[7] Audrey Kemp, *What Trump's win – and $215m worth of anti-trans ads – mean for the future of campaigning*, The Drum (Nov. 6, 2024), https://www.thedrum.com/news/2024/11/06/after-donald-trump-s-victory-marketers-weigh-their-role-countering-divisive.

[8] Lauren Barrón-López et al., *Why anti-transgender political ads are dominating the airwaves this election*, PBS News (Nov. 2, 2024 5:35 PM), https://www.pbs.org/newshour/show/why-anti-transgender-political-ads-are-dominating-the-airwaves-this-election.

[9] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, *supra* note 2.

37.     On December 23, 2024, after winning the election, President Trump affirmed his intent to implement discriminatory policies through executive action, stating "with a stroke of [his] pen on day one," he would "stop the transgender lunacy" and "get transgender out of the military and out of our elementary schools and middle schools and high schools."[10]

38.     The official acts of President Trump and his administration since January 20, 2025, have consistently targeted transgender people.

39.     Under the President's leadership, the federal government has undertaken a sustained effort to eliminate any reference to transgender people from federal government websites and other materials. For example, the State Department's website that formerly provided advice for "LGBTQI+ Travelers" was revised to provide advice only for "LGB Travelers."[11] Similarly, a State Department web page providing "Resources for LGBTQI+ Prospective Adoptive Parents" was revised to provide resources only for "LGB Prospective Adoptive Parents."[12] In addition, stopbullying.gov, a website hosted by the Department of Health and Human Services, removed articles on "LGBT Youth" and "Transgender" bullying.[13] Information related to health and healthcare for transgender people was also eliminated from federal government websites.[14] The

---

[10] Azcentral.com and The Arizona Republic, *Turning Point USA Donald Trump full speech: The 'golden age of America' begins now, says Trump*, YouTube (Dec. 23, 2024), https://www.youtube.com/watch?v=XuIeXJw6BA8, at 57:02-24.

[11] Jo Yurcaba, *Government agencies scrub LGBTQ web pages and remove info about trans and intersex people*, NBC News (Feb. 3, 2025), https://www.nbcnews.com/nbc-out/out-politics-and-policy/government-agencies-scrub-lgbtq-web-pages-remove-info-trans-intersex-p-rcna190519.

[12] *Id.*

[13] Nico Lang, *Trump Is Purging Federal Websites of LGBTQ+ Content. Here's What's Been Affected So Far*, Them (Feb. 7, 2025), https://www.them.us/story/trump-administration-federalwebsites-lgbtq-content-deleted-cdc-doe-usaid.

[14] Carla K. Johnson, *Health info wiped from federal websites following Trump order targeting transgender rights*, PBS News (Jan. 31, 2025), https://www.pbs.org/newshour/health/health-info-wiped-from-federal-websites-following-trump-order-targeting-transgender-rights.

National Park Service removed references to the word "transgender" from its webpage about the Stonewall National Monument.[15] An Army museum covered up a display honoring transgender soldiers.[16] Other examples abound.[17]

40.    The administration has also revoked funding and eliminated programming for transgender people, including removing a dedicated suicide hotline available to transgender youth callers.[18]

41.    In addition, President Trump has issued multiple Executive Orders that seek to eliminate equality for transgender people in multiple arenas—including housing, social services, schools, sports, healthcare, employment, international travel, and military service. *See* Executive Orders 14168 (federal funding, homeless shelters, prisons, employment, international travel), 14183 (military), 14187 (healthcare), 14190 (schools), 14201 (sports).

42.    The first of these orders was Executive Order 14168, entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the

---

[15] Elizabeth Wolfe, *'Transgender' and 'queer' erased from Stonewall Uprising national monument website*, CNN (Feb. 13, 2025), https://www.cnn.com/2025/02/13/us/stonewall-inn-national-monument-transgender/index.html.

[16] Michelle Del Rey, *Army museum covers display honoring transgender soldiers*, The Independent (Feb. 7, 2025), https://www.the-independent.com/news/world/americas/army-museum-transgender-soldiersb2694440.html

[17] *See, e.g.*, Yurcaba, *supra* note 11; Lang, *supra* note 13; Johnson, *supra* note 14; Tessa Gervasini, *Federal government scrubs transgender language from websites*, Catholic News Agency (Feb. 4, 2025), https://www.catholicnewsagency.com/news/262005/federal-government-scrubs-transgender-language-from-websites; Kevin Collier & Ben Goggin, *DOJ ordered review of 'gender ideology' compliance at child safety authority*, NBC News (Feb. 7, 2025), https://www.nbcnews.com/politics/donald-trump/doj-orders-child-safety-authority-comply-trumps-gender-ideology-order-rcna191282; Ethan Corey, *Trump DOJ Erases Trans People from Crime Data Surveys*, The Appeal (May 5, 2025), https://theappeal.org/trump-doj-erases-trans-people-from-crime-data-surveys/.

[18] Brooke Sopelsa & Jo Yurcaba, *Trump administration shuts down LGBTQ youth suicide hotline*, NBC News (July 17, 2025), https://www.nbcnews.com/nbc-out/out-news/trump-shuts-down-lgbtq-youth-suicide-hotline-rcna219090.

"Gender Ideology Order"). Section 2 of the Order provided definitions of "sex," "women," "girls," "men," "boys," "female," and "male" to ensure that no federal laws or policies recognize transgender people and to deny transgender people equal treatment.

43.     Section 2(f) of the Gender Ideology Order defines "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa." And Section 2(g) defines gender identity as "a fully internal and subjective sense of self, disconnected from biological reality and sex" that "does not provide a meaningful basis for identification."

44.     Section 3(e) of the Gender Ideology Order requires federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) similarly declares that "Federal funds shall not be used to promote gender ideology."

45.     In addition, President Trump issued Executive Order 14183 (the "Military Ban"), which bans transgender people from serving in the military. Section 1 of that Order declares that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service"; "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"; and "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with" the qualities of "humility" and "selflessness."

46.     The President next issued Executive Order 14187, *Protecting Children From Chemical and Surgical Mutilation* (the "Healthcare Order"), which eliminated federal funding for healthcare for transgender people under the age of 19. Attached as **Exhibit B** and incorporated by reference into this complaint is a true and correct copy of the Healthcare Order.

47.     Section 1 of the Healthcare Order declared that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."

48.     Section 2(a) of the Healthcare Order defined the terms "child" and "children" to include anyone under the age of 19.

49.     Section 2(c) of the Healthcare Order defined "the use of puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex" and "the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex" as "chemical . . . mutilation."

50.     Section 6 of the Healthcare Order directed the Secretary of Defense to "commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children."

**IV.    Following the President's orders, DoD reversed its prior policy and banned gender transition medications from being covered by TRICARE or provided at military hospitals and clinics.**

51.     On or about March 13, 2025, the Acting Assistant Secretary of Defense for Health Affairs issued a memorandum (the "March 13 Memorandum"), stating in relevant part:

> [S]ection six of EO 14187, requires the Secretary of Defense to exclude from TRICARE coverage the following care when provided to individuals under 19 years of age:
>
> (i) the use of puberty blockers, including Gonadotropin-Releasing Hormone (GnRH) agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; [and]

> (ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex[.]
>
> . . . Consequently, consistent with applicable federal law, section six of EO 14187, and DoD policy, the provision of GnRH agonists, endocrine treatment involving the use of cross-sex hormones, and sex gender changes for the treatment of gender dysphoria in minors (under the age of 19) are excluded from TRICARE private sector care coverage and may not be provided within the direct care system.

The "direct care system" mentioned in the Memorandum includes Walter Reed National Military Medical Center and all other military hospitals, clinics, and MTFs. Attached as **Exhibit C** and incorporated by reference into this complaint is a true and correct copy of the March 13 Memorandum.

52.     On April 21, 2025, the Acting Assistant Secretary of Defense for Health Affairs issued additional guidance stating that "[t]he Department's policy prohibits both the initiation and continuation of puberty blockers or cross-sex hormone therapy" for transgender adolescents and 18-year-old adults receiving treatment at MTFs (the "April 21 Additional Guidance").[19] Attached as **Exhibit D** and incorporated by reference into this complaint is a true and correct copy of the April 21 Additional Guidance.

53.     On June 11, 2025, the TRICARE Policy Manual was revised to mirror the language of the Healthcare Order (the "June 11 Policy Manual"). The revised manual excludes coverage for "puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex," and for the "use of sex-hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex." TRICARE

---

[19] The April 21 Additional Guidance created a narrow exception to allow MTF providers to prescribe reduced dosages to existing patients for 6 to 12 weeks before terminating treatment—a process known as "tapering"—but specified that tapering prescriptions would not be filled through military pharmacies and would not be covered by TRICARE.

Policy Manual 6010.63-M, Ch. 7, § 1.2, sub. 2.4 (Change 35, June 11, 2025). The new exclusions

apply to transgender adolescents and 18-year-olds. Attached as **Exhibit E** and incorporated by

reference into this complaint is a true and correct copy of the June 11 Policy Manual. Also

attached as **Exhibit F** and incorporated by reference into this complaint is a redline showing the

changes made to the manual on June 11, 2025 (referred to on the TRICARE website as "Change

35").[20]

54.    The March 13 Memorandum, April 21 Additional Guidance, and June 11 Policy

Manual (collectively, "Implementing Rules") reverse prior policy and practice, which for years

had permitted transgender adolescents and adults to get medically necessary gender transition

medications at MTFs and to obtain TRICARE coverage for those medications.

55.    The effective dates listed for the new exclusions set forth in the June 11 Policy

Manual are December 23, 2024 for adolescents under age 18 and March 13, 2025 for 18-year-old

adults (the date of DoD's March 13 Memorandum implementing Section 6 of the Healthcare

Order).

56.    DoD did not notify Plaintiffs or other TRICARE beneficiaries about this significant

change in benefits as required by 10 U.S.C. § 1097d.

57.    On May 9, 2025, Defendant Ferrara issued another memorandum banning gender

transition care at MTFs for all transgender adults regardless of age (the "May 9 Memorandum").

Specifically, the May 9 Memorandum prohibits the prescription of hormone therapy for gender

---

[20] The previous version of the TRICARE Policy Manual contained two sections related to gender
dysphoria treatment: (1) section 1.2 covered care for dates of service on or before June 30, 2022,
and (2) section 1.3 covered dates of service on or after July 1, 2022. The revisions made on June
11, 2025, known as "Change 35," removed the section covering care for dates of service before
June 30, 2022, leaving only a single section (the new Section 1.2) covering dates of service on or
after July 1, 2022. *Compare* Ex. A, *with* Ex. E.

dysphoria "at military medical treatment facilities (MTFs)" for "Service members and all other covered beneficiaries 19 years of age and older."

58.     DoD's Implementing Rules and May 9 Memorandum unlawfully modified the scope of medical care provided at MTFs contrary to 10 U.S.C. § 1073d(f)(1), which states the Secretary of Defense "may not modify the scope of medical care provided at a military medical treatment facility" unless he first "submits to the Committees on Armed Services of the House of Representatives and the Senate a notification of the proposed modification in scope" and then waits 180 days. Defendants did not comply with these mandatory procedures.

## V.     The Healthcare Order and DoD's Implementing Rules are not authorized by statute.

59.     In addition to tracking Section 6 of the Healthcare Order, DoD's March 13 Memorandum cited Section 708 of the Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025 (NDAA FY25), Pub. L. 118-159, December 23, 2024. The revised June 11 Policy Manual also indicates that it implements Section 708 by incorporating the effective date of NDAA FY25.

60.     The Healthcare Order and DoD's Implementing Rules sweep more broadly than Section 708 in two key respects.

61.     First, the Order and DoD's Implementing Rules ban TRICARE coverage for 18-year-olds who are legal adults, and DoD's policies ban gender transition care at MTFs for beneficiaries of all ages. By contrast, Section 708 applies only to TRICARE coverage for minors under age 18.

62.     Second, the Healthcare Order and DoD's Implementing Rules categorically ban TRICARE coverage for puberty blockers and hormone therapy for all transgender adolescents and 18-year-old adults in all circumstances. The language of Section 708 does not support a categorical ban on these medications.

63.     Section 708 only applies to "medical interventions for the treatment of gender dysphoria that could result in sterilization." Puberty blockers and hormones for treatment of gender dysphoria do not cause "sterilization." As such, the text of Section 708 does not support DoD's sweeping ban on care and coverage.

64.     DoD's March 13 Memorandum states that "gonadotropin-releasing hormone (GnRH) agonists [puberty blockers] and cross-sex hormone treatment could permanently impact fertility and result in sterilization." This statement misstates the medical evidence by conflating potential fertility impacts with sterilization. DoD then uses this conflation to categorically deny gender transition treatments to all transgender adolescents and young adults, despite the absence of individualized medical justification and despite the statute's limited scope, which does not support such a broad application.

65.     The Healthcare Order and DoD's Implementing Rules contravene the intent of Section 708, as confirmed by its legislative history, which shows that Congress considered but ultimately decided not to preclude coverage of hormones and puberty blockers in all circumstances. An earlier draft of NDAA FY25 specifically excluded "hormone therapy" and "puberty blockers" in addition to "medical interventions for the treatment of gender dysphoria that could result in sterilization." Nat. Def. Auth. Act for Fiscal Year 2025, S. 4638, § 709, 118th Cong. (2024). In the enacted legislation, the references to "hormone therapy" and "puberty blockers" were stripped out, suggesting that Congress specifically rejected a broad ban on coverage for those medications.

66.     In sum, Section 6 of the Healthcare Order and DoD's Implementing Rules are not based on or supported by Section 708.

## VI.    **DoD's care and coverage bans will harm Plaintiffs.**

67.     Access to medication for gender dysphoria is critical to the health and wellbeing of transgender adolescent and young adult Plaintiffs.

68.     Medical experts in the treatment of gender dysphoria recognize that the termination and denial of puberty blockers and hormone therapy cause serious medical harms.

### A.    **David Doe and Diana Doe**

69.     Diana Doe is a ███████ transgender girl whose father ████████████████. She and her family receive coverage through TRICARE Prime.

70.     Diana has undergone a medically supported transition to live as a girl. Diana has a diagnosis of gender dysphoria.

71.     Starting before puberty, and even before she had the language to explain it, Diana was uncomfortable with her birth sex. That discomfort made her hate having her hair cut short and in response, as she grew older, she started to wear it long. On a few occasions when strangers perceived her and referred to her as a girl, Diana felt comfortable and happier with that. After Diana entered puberty and her body began changing, her distress surrounding her birth sex intensified. This distress amplified other negative emotions she was experiencing. Her mental health suffered, she began missing school, and she was in danger of failing classes.

72.     After Diana shared with her mother that she was a girl and discussed the distress she was experiencing from her gender dysphoria, her parents sought medical advice from a pediatric endocrinologist at Walter Reed. Diana also spoke with her psychotherapist about her gender dysphoria. At the advice of the endocrinologist and psychotherapist, and with the consent and support of her parents, Diana began taking female hormones to alleviate her gender dysphoria ██████.

73.     Diana lives as a girl. She has adopted a feminine name and is referred to with female pronouns. Her school, friends, and immediate and extended family have all supported her gender transition.

74.     Hormone therapy has alleviated the distress Diana felt related to her gender dysphoria. Since she started medical treatment, Diana's parents have observed major improvements in her mental health and self-esteem. She has grown more communicative with her parents, her school attendance has improved, and her relationships with her family and her peers have grown stronger.

75.     In April 2025, Diana's parents learned that her access to hormone therapy through the military health system would be cut off. Diana received her last prescription from her pediatric endocrinologist around that same time. They subsequently learned that Walter Reed would not provide any care related to Diana's gender dysphoria, other than mental health services. In addition to meaning Diana could no longer get prescriptions from her doctor, this meant Walter Reed would not conduct routine lab work to monitor her treatment.

76.     In May 2025, Diana's parents received a notice from Express Scripts that the preauthorization for Diana's hormone medications had been voided. However, they never received the required written notice from TRICARE of significant changes in benefits.

77.     DoD's ban on treatment has disrupted Diana's established care relationship. Over time, Diana had developed significant trust with her Walter Reed pediatric endocrinologist, who had become familiar with her medical history, individual response to treatment, and family dynamics. Diana's parents are concerned about the challenges of starting over with a new provider, including the time needed to rebuild trust, the risk of treatment gaps during the transition, and the potential for less specialized expertise in transgender adolescent care. They worry that a new

provider will need months to understand Diana's specific medical needs and treatment response, potentially compromising the continuity of care that has been effective for her.

78.     In addition, the TRICARE coverage exclusion means that Diana's parents will need to pay out-of-pocket for her medical care, which is a significant expense.

79.     Hormone therapy is required medical treatment for Diana's medical condition. It is essential to her health and wellbeing. Ending hormone therapy would endanger her health.

**B.     Nicole Noe and Nathan Noe**

80.     Nathan Noe is a ▮▮▮▮▮ transgender boy whose mother, Nicole Noe, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮. Their family has health insurance through TRICARE Prime.

81.     Nathan has a diagnosis of gender dysphoria. He has undergone a medically indicated and supported process of gender transition and lives as male.

82.     As early as elementary school, Nathan felt uncomfortable being seen as a girl. Even before he had language to explain it and before he could tell others, he identified as a boy and did what he could to live that way. To outwardly manifest what he experienced internally, he wore boys' clothes and kept his hair cut short in boys' styles. When people perceived him as a boy, Nathan felt comfortable and did not correct them. When Nathan was young, his parents thought Nathan was simply being a tomboy.

83.     As he grew, Nathan had multiple conversations with his parents about not feeling like or being a girl and wanting to be a boy. Nathan's parents increasingly became aware of the distress Nathan experienced when others did not treat him as a boy. As Nathan approached puberty and his distress over not being recognized and treated as a boy intensified, his parents sought medical advice from a healthcare provider.

84.     Nathan's parents consulted with his pediatrician and sought specialized care from a military endocrinologist, with whom they met multiple times. The endocrinologist recommended

puberty blockers for Nathan due to his increasing distress as puberty progressed. The endocrinologist explained that puberty blockers would give Nathan additional time to work with a psychotherapist to address his distress and allow Nathan and his family to make informed decisions about potential future treatment options. Nathan's parents also consulted with a behavioral health specialist. After carefully considering the available options and medical recommendations, Nathan's parents agreed that he should begin puberty blocking medication, ███████████.

85.    In the following years, Nathan continued using military treatment facilities to access care, primarily relying on Walter Reed in Maryland.

86.    Nathan has consistently identified as a boy from before and throughout his medical treatment for gender dysphoria.

87.    In ███████████ and upon the advice of his medical care team, Nathan started testosterone medication. ████████████████████████ ███████████████████████████.

88.    The hormone therapy Nathan has received has successfully alleviated the anxiety and distress he experienced from gender dysphoria.

89.    Nathan continues to take testosterone as treatment for gender dysphoria. He is now a healthy and well-adjusted ████████ student.

90.    In May 2025, Nathan's doctor at Walter Reed communicated that all military health system clinicians would be required to cease writing prescriptions for hormone therapy for transgender patients under 19.

91.    Nathan's parents never received the required written notice from TRICARE about significant changes in his benefits relating to treatment of gender dysphoria.

92.     Nathan is now without a doctor to prescribe the hormone therapy he needs to continue medically necessary treatment for gender dysphoria. While his parents are figuring out where they can try to continue to get medical care for Nathan, they have serious concerns about the harm he will experience in establishing a patient relationship with a new doctor and the disruption that will create. He has had a longstanding relationship with his Walter Reed care team. Transfer to a new provider will disrupt the continuity of that care. As a result of TRICARE's announced changes in coverage, they also anticipate needing to pay out-of-pocket for any new testosterone prescriptions that Nathan needs before turning nineteen.

93.     Hormone therapy is required medical treatment for Nathan's medical condition. It is essential to his health and wellbeing. Ending hormone therapy would endanger his health.

C.     **Parker Poe**

94.     Parker Poe is an ▇▇▇▇▇ transgender young man. ▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇. Parker and his family receive healthcare coverage through TRICARE Prime.

95.     Parker has undergone a medically supported transition to live as a man at ▇▇▇ ▇▇▇▇▇▇▇▇▇▇. Parker has a diagnosis of gender dysphoria.

96.     From a young age, Parker felt a sense of discomfort with his birth sex. In response to that internal discomfort, he presented himself as a tomboy. When he grew older, he decided to try expressing himself more femininely, but he could not tolerate doing so because it was inconsistent with who he was. His discomfort and distress intensified until it became clear to him that he was a boy.

97.     Eventually, Parker told his parents he was a boy – first his mother, and then his father, who was away from his family as part of his military duties at the time. To understand how they could ensure their child's health as he went through puberty, they sought medical advice from a healthcare professional.

98.     Initially, Parker worked with a psychotherapist, who tried to help him address his gender dysphoria. His pediatrician also referred him to a doctor at ████ for further treatment. In addition to psychotherapy, Parker used a ████████████ prescribed by his doctor to try to address the gender dysphoria he experienced. However, his gender dysphoria persisted.

99.     On some days, the distress Parker felt as part of his gender dysphoria left him crying in his bed. When school staff accidentally referred to him as his birth sex or used his birth name at school, Parker became stressed and sometimes experienced panic attacks.

100.    ████████████████████████████ ████████████████████████████ ██████████████████████████.

101.    To further treat his gender dysphoria, Parker started testosterone ████, at the advice of his doctor at ████ and with the support and consent of his parents.

102.    Parker continues to take testosterone, which has successfully alleviated the distress he experienced from gender dysphoria.

103.    ████████████████████████████ ████████████████████████████ ████████████

104.    In or around March 2025, Parker's family learned from his doctor at ████ that TRICARE coverage for his testosterone would no longer be available, and that the doctor would no longer be able to treat Parker for gender dysphoria.

105.    Parker and his family subsequently received a notice from Express Scripts that the preauthorization for his testosterone was no longer valid. However, neither Parker nor his parents ever received the required written notice from TRICARE of significant changes in benefits.

106.     As a result of the policy changes implemented by DOD and DHA, Parker has not been able to access treatment for his gender dysphoria at ████ or obtain TRICARE coverage for this and related care, ███████.

107.     This has significantly disrupted Parker's care. He is months overdue for the lab work that he needs to monitor his treatment. Additionally, without TRICARE coverage, Parker's prescription for testosterone ████ was too expensive to purchase out-of-pocket. As a result, ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████; this process has resulted in unnecessary stress.

108.     Parker's mother looked into a civilian doctor recommended for Parker, but learned it would be cost-prohibitive for him to become a patient there. While Parker hopes ████████ ████████ to obtain a new testosterone prescription (which his parents plan to pay out-of-pocket to fill), it will be difficult for him to start a new relationship with a healthcare provider he has never met before. Losing access to the care he needed at ████ has left Parker with a deep sense of distrust in the healthcare system. Additionally, Parker and his parents remain uncertain about how he will get necessary lab work done, which had previously been a routine part of his care.

109.     Testosterone has allowed Parker to grow into a generally happy and healthy young adult man ██████████████████. However, after the government's policy changes eliminated access to the medical treatment he needed at ████, Parker experienced increased anxiety. He struggled to cope with a loss of self-esteem and started seeing a therapist again.

110.     Hormone therapy is required medical treatment for Parker's medical condition. It is essential to his health and wellbeing. Ending hormone therapy would endanger his health.

## CLAIMS FOR RELIEF

### COUNT I

**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Agency Action Taken Without Observance of Procedure Required by Law**

111.    All allegations above are incorporated herein by reference.

112.    DoD's Implementing Rules are final agency action. The Implementing Rules represent the consummation of the agency's decision-making process. Legal consequences flow directly from the Implementing Rules because they deprive Plaintiffs and other TRICARE beneficiaries of medically necessary healthcare at MTFs and deny TRICARE coverage for that care.

113.    The APA requires courts to set aside and vacate agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

114.    Under the APA, substantive rules promulgated by an agency must undergo notice-and-comment rulemaking procedures to allow the public and affected parties the opportunity to weigh in on changes to agency policy. 5 U.S.C. § 553.

115.    The Implementing Rules are substantive rules with the force and effect of law and are therefore subject to notice-and-comment rulemaking procedures. The Implementing Rules effectively revoke pre-existing policies on the scope of MTF care and TRICARE coverage, and institute new binding rules that affirmatively change the rights of TRICARE beneficiaries and the obligations of Defendants with respect to the healthcare provided at MTFs and the TRICARE coverage available. The Implementing Rules effectively add a new general exclusion not listed in the comprehensive regulations governing TRICARE benefits, 32 C.F.R. § 199.4.

116.    Defendants did not comply with the notice-and-comment rulemaking procedures required for all new substantive rules, and thus impermissibly promulgated a new rule in violation of the APA.

117.    In addition, Defendants did not follow the beneficiary notice requirements set forth in 10 U.S.C. § 1097d before making a significant change to benefits provided by the TRICARE program.

118.    DoD's Implementing Rules, along with its May 9 Memorandum terminating medically necessary gender transition care at MTFs for all transgender adults, also modified the scope of medical care provided at MTFs without observance of the notice procedures and 180-day waiting period required by 10 U.S.C. § 1073d(f)(1).

119.    Plaintiffs are harmed by these unlawful acts.

## COUNT II

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Agency Action Not in Accordance with Law and in Excess of Statutory Authority**
**Arbitrary and Capricious Agency Action**

120.    All allegations above are incorporated herein by reference.

121.    The APA requires courts to set aside and vacate agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

122.    The traditional tools of statutory interpretation confirm that DoD's Implementing Rules exceed the scope of and are contrary to the clear meaning of Section 708 of NDAA FY25. Congress explicitly limited the TRICARE exclusion set forth in Section 708 to treatments for individuals "under the age of 18." DoD nonetheless adopted an exclusion for individuals "under 19 years of age."

26

123.    In addition, Congress explicitly limited the TRICARE exclusion set forth in Section 708 to "medical interventions for the treatment of gender dysphoria that could result in sterilization," and considered but ultimately rejected a broader ban on "hormone therapy" and "puberty blockers." DoD nonetheless implemented a categorical exclusion of all hormones and puberty blockers from TRICARE coverage, even though those medications do not present a risk of sterilization.

124.    Because DoD's Implementing Rules contravene the plain meaning and intent of Section 708, they are not in accordance with law and exceed DoD's lawful authority to effectuate the statute.

125.    The determination in the March 13 Memorandum that puberty blockers and hormones could "result in sterilization" is arbitrary and capricious. The Memorandum failed to offer any explanation at all in support of this determination, did not address the contradiction between this determination and the plain meaning and intent of Section 708, and failed to consider all relevant factors, including medical research showing that puberty blockers and hormones are not sterilizing.

126.    DoD's Implementing Rules are also arbitrary and capricious because they deny TRICARE coverage and MTF care for transgender 18-year-olds, who are not subject to the coverage exclusion set forth in Section 708 of NDAA FY25. DoD's decision to revoke coverage and disrupt care for these adults is a total reversal in policy that is unsupported by any citation or explanation. The decision is also contrary to medical evidence showing the benefits of providing medically necessary gender transition care to adults and ignores the harms of denying such care.

127.    DoD's Implementing Rules are not the product of reasoned decision-making and were arbitrary and capricious.

128.   Plaintiffs are harmed by these unlawful acts.

## COUNT III

### Actions *Ultra Vires*
### Violation of Separation of Powers and Conflicts with Statutory Law

129.   All allegations above are incorporated herein by reference.

130.   Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

131.   Article I of the Constitution vests the legislative power in Congress. Congress exercised that Article I legislative authority to enact Section 708 of NDAA FY25.

132.   The Executive Branch cannot usurp Congress's legislative authority on its own mandate; any legislative authority wielded by the Executive Branch must have been delegated within the confines of the Constitutional limitations protecting the respective spheres of government. The Executive Branch has no constitutional power to enact, amend, or repeal parts of duly enacted statutes.

133.   Section 6 of the Healthcare Order effectively seeks to amend Section 708 to broaden its application to legal adults and to bar TRICARE coverage of entire classes of medications that Congress specifically chose not to include in the statute. The President has no constitutional or statutory authority to override the will of Congress in this manner.

134.   As such, Section 6 of the Healthcare Order and DoD's Implementing Rules usurp Congress's Article I authority, violate the constitutional separation of powers, and are *ultra vires*.

135.   Plaintiffs are harmed by these unlawful acts.

## COUNT IV

### Relief under the Declaratory Judgment Act, 28 U.S.C. § 2201

136.   All allegations above are incorporated herein by reference.

137.    The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

138.    This case presents an actual controversy. DoD has invoked Section 708 of NDAA FY25 to deprive Plaintiffs of medically necessary healthcare at MTFs and to deny TRICARE coverage for medically necessary care delivered through the private sector.

139.    Through this Complaint, Plaintiffs have filed an appropriate pleading to have their rights declared. The Court can resolve this controversy by declaring that: (a) Plaintiffs' medically necessary hormone medications are not medical interventions that "could result in sterilization" for Plaintiffs; (b) Section 708 of NDAA FY25 does not authorize MTFs to deny Plaintiffs medically necessary treatment for gender dysphoria, including hormone therapy, bloodwork, and monitoring; (c) Section 708 of NDAA FY25 does not authorize DoD to deny TRICARE coverage for Plaintiffs' hormone medications and related bloodwork and appointments that are medically necessary to treat their gender dysphoria; (d) Section 6 of the Healthcare Order and DoD's Implementing Rules constitute unlawful executive action; and (e) DoD therefore lacks authority to deny Plaintiffs MTF care or TRICARE coverage for medically necessary hormone medications to treat their gender dysphoria.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant the following relief:

(1)    Issue a judgment under 28 U.S.C. §§ 2201–02 declaring that Section 708 of NDAA FY25 does not prohibit TRICARE from covering Plaintiffs' medically necessary

hormone medications and does not prohibit MTFs from providing such medications and related medical care;

(2)     Issue a judgment under 28 U.S.C. §§ 2201–02 declaring that Section 6 of the Healthcare Order and DoD's Implementing Rules are *ultra vires* and violate the constitutional separation of powers and conflict with statutory law;

(3)     Issue a judgment under 28 U.S.C. §§ 2201–02 declaring that the DoD Implementing Rules violate the Administrative Procedure Act;

(4)     Hold unlawful and set aside the DoD Implementing Rules under the Administrative Procedure Act;

(5)     Enter a permanent injunction prohibiting Defendants and their officers, employees, servants, agents, appointees, and successors from enforcing Section 6 of the Healthcare Order and the DoD Implementing Rules;

(6)     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412, 42 U.S.C. § 12205, and other applicable laws; and

(7)     Grant such other and further relief as the Court deems just and proper.

Dated: September 8, 2025                 Respectfully submitted,

                                         BROWN GOLDSTEIN & LEVY LLP


                                         _____/s/ *Eve Hill*_____
                                         EVE HILL (Bar No. 19938)
                                         120 East Baltimore Street, Suite 2500
                                         Baltimore, MD  21202
                                         Telephone:    (410) 962-1030
                                         Facsimile:    (410) 385-0869
                                         ehill@browngold.com

                                         KEKER, VAN NEST & PETERS LLP


                                         _____/s/ *Sharif E. Jacob*_____
                                         SHARIF E. JACOB (*Pro Hac Vice Pending*)
                                         LUIS G. HOYOS (*Pro Hac Vice Pending*)
                                         SARA R. FITZPATRICK (*Pro Hac Vice Pending*)
                                         LIAM BROWN (*Pro Hac Vice Pending*)
                                         633 Battery Street
                                         San Francisco, CA 94111-1809
                                         Telephone:  415 391 5400
                                         Facsimile:  415 397 7188
                                         sjacob@keker.com
                                         lhoyos@keker.com
                                         sfitzpatrick@keker.com
                                         liambrown@keker.com

                                         GLBTQ LEGAL ADVOCATES & DEFENDERS


                                         _____/s/ *Jennifer Levi*_____
                                         JENNIFER LEVI (*Pro Hac Vice Pending*)
                                         SARAH AUSTIN (*Pro Hac Vice Pending*)
                                         HANNAH HUSSEY (*Pro Hac Vice Pending*)
                                         ELIZABETH RODRIGUEZ-ROSS (*Pro Hac Vice Pending*)
                                         18 Tremont Street, Suite 950
                                         Boston, MA  02108
                                         Telephone:    (617) 778-6961
                                         Facsimile:    (617) 426-3594
                                         jlevi@gladlaw.org
                                         saustin@gladlaw.org
                                         hhussey@gladlaw.org
                                         erodriguezross@gladlaw.org

NATIONAL CENTER FOR LGBTQ RIGHTS


_____/s/ Shannon Minter_____
SHANNON MINTER (*Pro Hac Vice Pending*)
CHRISTOPHER F. STOLL (*Pro Hac Vice Pending*)
1401 21st Street, #11548
Sacramento, CA  95811
Telephone:    (415) 365-1320
Facsimile:    (415) 392-8442
sminter@nclrights.org
cstoll@nclrights.org

*Attorneys for Plaintiffs*
*DIANA DOE, by and through her parent and next of friend*
*David Doe, NATHAN NOE, by and through his parent and*
*next of friend Nicole Nelson, and PARKER POE*