# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

|  |  |
|---|---|
| DIANA DOE, PARKER POE, and BRENDAN BOE, <br><br> *Plaintiffs,* <br><br> v. <br><br> DEPARTMENT OF DEFENSE; PETE HEGSETH, in his official capacity as Secretary of Defense; ANTHONY J. TATA, in his official capacity as the Under Secretary of Defense for Personnel and Readiness; KEITH BASS, in his official capacity as Assistant Secretary of Defense for Health Affairs; DEFENSE HEALTH AGENCY; and DARIN K. VIA, in his official capacity as Director of the Defense Health Agency, <br><br> *Defendants.* | REDACTED <br><br> Civil Action No. 8:25-cv-02947-DLB <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

\* Plaintiffs have filed a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs Diana Doe, Parker Poe, and Brendan Boe to proceed under pseudonyms.

## INTRODUCTION

1.      For nearly a decade, servicemembers of our Armed Forces relied on the military health system and the TRICARE[1] program to obtain medically necessary medications for their transgender dependent family members. Then, following executive orders issued by the President in January 2025 as part of a broad effort to strip equal rights from transgender people, the Department of Defense ("DoD") and the Defense Health Agency ("DHA") suddenly reversed course, adopting a categorical exclusion of this essential medical care from TRICARE coverage for some adults and banning military hospitals and clinics from providing this care for all adults. As a result, Plaintiffs and other transgender dependent family members across the country were abruptly cut off from their treating providers, putting them at risk of losing access to essential healthcare. The new TRICARE policies also require some Plaintiffs to pay for care out-of-pocket, which is a significant expense and financial burden.

2.      TRICARE's sudden refusal to cover medically necessary care has inflicted profound harm on Plaintiffs. Their prescriptions were cut off without notice. Their trusted doctors at military hospitals were forced to abandon them. Some Plaintiffs' families now face significant, and in some cases crushing, out-of-pocket costs or the prospect of watching their family member's health deteriorate without the medications that kept them healthy and stable. This was not an abstract policy shift—it was an immediate and devastating disruption of essential healthcare that affects the physical and psychological wellbeing of Plaintiffs and other transgender members of military families throughout the country.

---

[1] "TRICARE" refers to the Department of Defense's healthcare program that provides insurance coverage to millions of current and former military servicemembers and their families.

4120365

3.     Defendants' sweeping restrictions on all gender-transition medications were imposed without statutory authority, without the notice-and-comment procedures required by the Administrative Procedure Act, and without providing TRICARE beneficiaries the notice that federal law mandates before benefits are reduced. Defendants exceeded their authority and disregarded statutory limits set by Congress.

4.     Plaintiffs bring this action under the Administrative Procedure Act to set aside DoD and DHA's new rules prohibiting adults' gender-transition care from being covered by TRICARE or provided at military hospitals and clinics because those rules were issued without observance of procedure required by law and are arbitrary, capricious, and in excess of statutory authority. This action also seeks to enjoin Defendants from implementing President Trump's executive order directing agencies to eliminate federal funding for transgender healthcare for people under the age of 19 and instructing DoD and DHA to ban TRICARE coverage for that care.

## JURISDICTION AND VENUE

5.     This action arises under the Constitution of the United States and the Administrative Procedure Act, 5 U.S.C. §§ 701–06.

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

7.     This Court has jurisdiction to review agency actions under 5 U.S.C. § 702.

8.     This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief under 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 65, and this Court's inherent equitable powers.

9.     This Court has authority to hold unlawful and set aside agency action, findings, and conclusions under 5 U.S.C. § 706.

4120365

10.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district. In addition, venue is proper under 28 U.S.C. § 1391(e)(1)(B) and (C) because defendants are agencies of the United States and officers of the United States sued in their official capacity; one or more plaintiffs reside in this district; and a substantial part of the events giving rise to this action occurred and continue to occur in this district.

## PARTIES

11.     Plaintiff Diana Doe is ▮▮▮▮▮▮ transgender woman. Because of concerns about her safety and privacy, Diana is proceeding pseudonymously. Diana resides in ▮▮▮▮▮▮▮▮▮▮.

12.     Plaintiff Parker Poe is ▮▮▮▮▮▮ transgender man. Because of concerns about his safety and privacy, he is proceeding anonymously. Parker is domiciled in ▮▮▮.

13.     Plaintiff Brendan Boe is ▮▮▮▮▮ transgender man. Because of concerns about his safety and privacy, he is proceeding anonymously. Brendan is domiciled in ▮▮▮▮▮▮.

14.     Defendant DoD is an agency of the United States government that, among other responsibilities, manages the needs of servicemembers and their families and oversees the military health system.

15.     Defendant Pete Hegseth is sued in his official capacity as the Secretary of Defense to the United States. The Secretary maintains authority, direction, and control over DoD. The Secretary is authorized to establish DoD policies, including by promulgating DoD Directives and Instructions that interpret and implement federal law. The Secretary is responsible for administering the TRICARE program, which provides worldwide medical, dental, and pharmacy programs to uniformed servicemembers, retirees, and their families. The Secretary is

4

also responsible for maintaining military medical treatment facilities ("MTFs"), where many

TRICARE beneficiaries, including Plaintiffs, receive care.

16.     Defendant Anthony J. Tata is sued in his official capacity as Under Secretary of

Defense for Personnel and Readiness. The Under Secretary is the principal staff assistant and

advisor to the Secretary of Defense concerning health affairs. He is responsible for developing

policies, plans, and programs for health and medical affairs, including the provision of health

services to dependents of servicemembers through the TRICARE program and the operation of

MTFs.

17.     Defendant Keith Bass is sued in his official capacity as the Assistant Secretary of

Defense for Health Affairs. The Assistant Secretary is the principal advisor to the Secretary of

Defense and the Under Secretary of Defense for Personnel and Readiness for all DoD health

policies, programs, and activities. He is responsible for providing and maintaining readiness for

medical services to servicemembers, their families, and other TRICARE beneficiaries. In

carrying out those responsibilities, the Assistant Secretary exercises authority, direction, and

control over DoD medical policy, facilities, programs, and funding.

18.     Defendant DHA is an agency within DoD that manages both the TRICARE

program and MTFs.

19.     Defendant Darin K. Via is sued in his official capacity as the Director of the

DHA. The Director reports to the Assistant Secretary of Defense for Health Affairs. The Director

oversees the TRICARE program and is responsible for the administration of all MTFs.

## FACTS

**I.    Gender dysphoria is a serious medical condition.**

20.     Gender dysphoria is a serious medical condition marked by the significant distress

or impairment that occurs when a transgender individual is unable to transition and to live in a

sex different than their birth sex. The condition is treatable. When left untreated, however, it causes serious physical and psychological harms.

21.     The current medically accepted treatment for gender dysphoria is to enable a transgender person to live in the sex different than their birth sex. This care is often referred to as "gender transition," and it is a highly effective treatment for gender dysphoria.

22.     The medical and scientific community recognize well-established protocols for treating gender dysphoria and for gender transition. These protocols are endorsed by the major medical and mental health associations in the United States, including but not limited to the American Medical Association, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

23.     The treatment for gender dysphoria for any particular patient depends on an individualized assessment of the patient's health condition and medical needs. Depending on clinical evaluation and medical need, treatment for gender dysphoria can include ongoing hormone therapy: testosterone for transgender men, and estrogen and anti-androgens for transgender women.

24.     Decades of peer-reviewed research support the safety and efficacy of gender transition treatments for transgender individuals. By contrast, untreated gender dysphoria results in ongoing and serious clinically significant distress that interferes with transgender people's abilities to live productive, healthy lives. The termination and denial of hormone therapy can cause serious medical harms.

4120365

II.   **For nearly a decade, TRICARE covered medically necessary gender transition medications for transgender young adults.**

25.    Consistent with accepted medical standards and scientific evidence, for nearly a decade, TRICARE has covered hormone therapy for transgender adults when clinically indicated.

26.    For the last several years, dependents of active-duty servicemembers and other TRICARE beneficiaries have been able to obtain medically necessary gender transition medications from MTFs and could fill their corresponding prescriptions through military pharmacies.

27.    Prior to June 11, 2025, the TRICARE policy manual indicated that coverage was available for this medically necessary care. That manual provided:

> Gender-affirming hormone therapy, also known as cross-sex hormone treatment, is covered for adult or adolescent beneficiaries when all of the following criteria are met:
>
> • The beneficiary meets the eligibility criteria outlined in the most current version of the Endocrine Society Clinical Practice Guidelines for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons.
>
> • The beneficiary has no contraindications to gender-affirming hormone therapy.

TRICARE Policy Manual 6010.63-M, Ch. 7, § 1.3 (Dec. 2022) (revised June 4, 2025); *see id.* § 1.2 (similar). Attached as **Exhibit A** and incorporated by reference into this complaint is a true and correct copy of the versions of Sections 1.2 and 1.3 of Chapter 7 of the TRICARE Policy Manual that were in place prior to June 11, 2025.

III.   **As part of a targeted reversal of legal equality for transgender people, the President ordered DoD to terminate TRICARE coverage for gender-transition medications.**

28.    For years, the President has expressed hostile views toward transgender people.

7

29.    During his 2024 presidential campaign, Donald Trump pledged a "day one" executive order to "cease all programs that promote the concept of sex and gender transition at any age."[2]

30.    Throughout the campaign, he used derogatory language to describe transgender Americans, calling them "deranged,"[3] and referring to transgender identity as "madness"[4] and "insanity."[5] He falsely claimed transgender identity was "never heard of in all of human history."[6]

31.    President Trump's campaign spent approximately $215 million on advertisements targeting transgender Americans and promoting anti-transgender policies.[7] These advertisements comprised over 40 percent of his campaign messaging in the weeks before the 2024 election.[8]

---

[2] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, Trump Vance: Make America Great Again! 2026 (Feb. 1, 2023), https://www.donaldjtrump.com/agenda47/president-trumps-plan-to-protect-children-from-leftwing-gender-insanity.

[3] Gabriel Bertrand, *Trump's Shocking Admission Exposes GOP's Bigoted Agenda*, Medium (June 17, 2023), https://medium.com/illumination/trumps-shocking-admission-exposes-gop-sbigoted-agenda-e981becb2c5f.

[4] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, *supra* note 2.

[5] Jackson Walker, *Trump vows to remove 'transgender insanity' and critical race theory from US schools*, IdahoNews (Dec. 23, 2024, 8:37AM), https://idahonews.com/news/nation-world/trump-vows-to-remove-transgender-insanity-and-critical-race-theory-from-us-schools-phoeniz-arizona-woke-speech-usa-donald-president-white-house-education-department-crt-trans-gender-lgbt; *Trump and Vance make anti-transgender attacks central to their campaign's closing argument*, NBC News (Nov. 1, 2024, 7:23 AM), https://www.nbcnews.com/nbcout/out-politics-and-policy/donald-trump-jd-vance-transgender-2024-election-rcna178390; Donald J. Trump, Truth Social (Dec. 17, 2023), https://truthsocial.com/@realDonaldTrump/posts/111599880929254153; Gabriel Bertrand, *supra* note 3; Joe Middleton, *Trump attacks transgender rights at Waco rally saying he will ban 'disfigurement of our youth'*, The Independent (Mar. 26, 2023), https://www.independent.co.uk/news/world/americas/donald-trump-transgender-waco-rallyb2308177.html.

[6] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, *supra* note 2.

[7] Audrey Kemp, *What Trump's win – and $215m worth of anti-trans ads – mean for the future of campaigning*, The Drum (Nov. 6, 2024), https://www.thedrum.com/news/2024/11/06/after-donald-trump-s-victory-marketers-weigh-their-role-countering-divisive.

[8] Lauren Barrón-López et al., *Why anti-transgender political ads are dominating the airwaves this election*, PBS News (Nov. 2, 2024 5:35 PM), https://www.pbs.org/newshour/show/why-anti-transgender-political-ads-are-dominating-the-airwaves-this-election.

4120365

32.    President Trump's campaign platform included a "Plan to Protect Children from Left-Wing Gender Insanity," which promised to deny legal recognition to transgender people and restrict access to medically necessary healthcare.[9]

33.    On December 23, 2024, after winning the election, President Trump affirmed his intent to implement discriminatory policies through executive action, stating "with a stroke of [his] pen on day one," he would "stop the transgender lunacy" and "get transgender out of the military and out of our elementary schools and middle schools and high schools."[10]

34.    The official acts of President Trump and his administration since January 20, 2025, have consistently targeted transgender people.

35.    Under the President's leadership, the federal government has undertaken a sustained effort to eliminate any reference to transgender people from federal government websites and other materials. For example, the State Department's website that formerly provided advice for "LGBTQI Travelers" was revised to provide advice only for "LGB Travelers."[11] Similarly, a State Department web page providing "Resources for LGBTQI+ Prospective Adoptive Parents" was revised to provide resources only for "LGB Prospective Adoptive Parents."[12] In addition, stopbullying.gov, a website hosted by the Department of Health and Human Services, removed articles on "LGBT Youth" and "Transgender" bullying.[13]

---

[9] *President Trump's Plan to Protect Children from Left-Wing Gender Insanity*, *supra* note 2.

[10] Azcentral.com and The Arizona Republic, *Turning Point USA Donald Trump full speech: The 'golden age of America' begins now, says Trump*, YouTube (Dec. 23, 2024), https://www.youtube.com/watch?v=XuIeXJw6BA8, at 57:02-24.

[11] Jo Yurcaba, *Government agencies scrub LGBTQ web pages and remove info about trans and intersex people*, NBC News (Feb. 3, 2025), https://www.nbcnews.com/nbc-out/out-politics-and-policy/government-agencies-scrub-lgbtq-web-pages-remove-info-trans-intersex-p-rcna190519.

[12] *Id.*

[13] Nico Lang, *Trump Is Purging Federal Websites of LGBTQ+ Content. Here's What's Been Affected So Far*, Them (Feb. 7, 2025), https://www.them.us/story/trump-administration-federalwebsites-lgbtq-content-deleted-cdc-doe-usaid.

Information related to health and healthcare for transgender people was also eliminated from federal government websites.[14] The National Park Service removed references to the word "transgender" from its webpage about the Stonewall National Monument.[15] An Army museum covered up a display honoring transgender soldiers.[16] Other examples abound.[17]

36.    The administration has also revoked funding and eliminated programming for transgender people, including removing a dedicated suicide hotline available to transgender youth callers.[18]

37.    President Trump has issued multiple Executive Orders that seek to eliminate equality for transgender people in multiple arenas—including housing, social services, schools, sports, healthcare, employment, international travel, and military service. *See* Executive Orders 14168 (federal funding, homeless shelters, prisons, employment, international travel), 14183 (military), 14187 (healthcare), 14190 (schools), 14201 (sports).

38.    The first of these orders was Executive Order 14168, entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*

---

[14] Carla K. Johnson, *Health info wiped from federal websites following Trump order targeting transgender rights*, PBS News (Jan. 31, 2025), https://www.pbs.org/newshour/health/health-info-wiped-from-federal-websites-following-trump-order-targeting-transgender-rights.

[15] Elizabeth Wolfe, *'Transgender' and 'queer' erased from Stonewall Uprising national monument website*, CNN (Feb. 13, 2025), https://www.cnn.com/2025/02/13/us/stonewall-inn-national-monument-transgender/index.html.

[16] Michelle Del Rey, *Army museum covers display honoring transgender soldiers*, The Independent (Feb. 7, 2025), https://www.the-independent.com/news/world/americas/army-museum-transgender-soldiersb2694440.html.

[17] *See, e.g.*, Yurcaba, *supra* note 11; Lang, *supra* note 13; Johnson, *supra* note 14; Tessa Gervasini, *Federal government scrubs transgender language from websites*, Catholic News Agency (Feb. 4, 2025), https://www.catholicnewsagency.com/news/262005/federal-government-scrubs-transgender-language-from-websites; Kevin Collier & Ben Goggin, *DOJ ordered review of 'gender ideology' compliance at child safety authority*, NBC News (Feb. 7, 2025), https://www.nbcnews.com/politics/donald-trump/doj-orders-child-safety-authority-comply-trumps-gender-ideology-order-rcna191282; Ethan Corey, *Trump DOJ Erases Trans People from Crime Data Surveys*, The Appeal (May 5, 2025), https://theappeal.org/trump-doj-erases-trans-people-from-crime-data-surveys/.

[18] Brooke Sopelsa & Jo Yurcaba, *Trump administration shuts down LGBTQ youth suicide hotline*, NBC News (July 17, 2025), https://www.nbcnews.com/nbc-out/out-news/trump-shuts-down-lgbtq-youth-suicide-hotline-rcna219090.

4120365

(the "Gender Ideology Order"). Attached as **Exhibit B** and incorporated by reference into this complaint is a true and correct copy of the Gender Ideology Order.

39.    Section 2 of the Order provided definitions of "sex," "women," "girls," "men," "boys," "female," and "male" that were designed to ensure no federal laws or policies recognize transgender people and to deny transgender people equal treatment.

40.    Section 2(f) of the Gender Ideology Order defined "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa." And Section 2(g) defined gender identity as "a fully internal and subjective sense of self, disconnected from biological reality and sex" that "does not provide a meaningful basis for identification."

41.    Section 3(e) of the Gender Ideology Order required federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) similarly declared that "Federal funds shall not be used to promote gender ideology."

42.    In addition, President Trump issued Executive Order 14183 (the "Military Ban"), which banned transgender people from serving in the military. Section 1 of that Order declares that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service"; "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"; and "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with" the qualities of "humility" and "selflessness."

43.    The President next issued Executive Order 14187, *Protecting Children From Chemical and Surgical Mutilation* (the "Healthcare Order"), which eliminated federal funding

11

for healthcare for transgender people under the age of 19. Attached as **Exhibit C** and incorporated by reference into this complaint is a true and correct copy of the Healthcare Order.

44.    Section 1 of the Healthcare Order declared that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."

45.    Section 2(a) of the Healthcare Order defined the terms "child" and "children" to include anyone under the age of 19.

46.    Section 2(c) of the Healthcare Order defined "the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex" as "chemical . . . mutilation."

47.    Section 6 of the Healthcare Order directed the Secretary of Defense to "commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children."

**IV.    Following the President's orders, DoD reversed its prior policy and banned gender transition medications from being covered by TRICARE or provided at military hospitals and clinics.**

48.    On or about March 13, 2025, the Acting Assistant Secretary of Defense for Health Affairs issued a memorandum (the "March 13 Memorandum"), stating in relevant part:

> [S]ection six of EO 14187, requires the Secretary of Defense to exclude from TRICARE coverage the following care when provided to individuals under 19 years of age:
>
> (i) the use of puberty blockers, including Gonadotropin-Releasing Hormone (GnRH) agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; [and]

12

(ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex[.]

. . . Consequently, consistent with applicable federal law, section six of EO 14187, and DoD policy, the provision of GnRH agonists, endocrine treatment involving the use of cross-sex hormones, and sex gender changes for the treatment of gender dysphoria in minors (under the age of 19) are excluded from TRICARE private sector care coverage and may not be provided within the direct care system.

The "direct care system" mentioned in the March 13 Memorandum includes Walter Reed National Military Medical Center and all other military hospitals, clinics, and MTFs. Attached as **Exhibit D** and incorporated by reference into this complaint is a true and correct copy of the March 13 Memorandum.

49.     On April 21, 2025, the Acting Assistant Secretary of Defense for Health Affairs issued additional guidance stating that "[t]he Department's policy prohibits both the initiation and continuation of puberty blockers or cross-sex hormone therapy" for transgender adolescents and 18-year-old adults receiving treatment at MTFs (the "April 21 Additional Guidance").[19] Attached as **Exhibit E** and incorporated by reference into this complaint is a true and correct copy of the April 21 Additional Guidance.

50.     On May 9, 2025, the Acting Assistant Secretary of Defense for Health Affairs issued another memorandum banning gender transition care at MTFs for all transgender adults regardless of age (the "May 9 Memorandum"). Specifically, the May 9 Memorandum prohibits the prescription of hormone therapy for gender dysphoria at MTFs for "Service members and all

---

[19] The April 21 Additional Guidance created a narrow exception to allow MTF providers to prescribe reduced dosages to existing patients for 6 to 12 weeks before terminating treatment—a process known as "tapering"—but specified that tapering prescriptions would not be filled through military pharmacies and would not be covered by TRICARE.

other covered beneficiaries 19 years of age and older." Attached as **Exhibit F** and incorporated

by reference into this complaint is a true and correct copy of the May 9 Memorandum.

51.    On June 11, 2025, the TRICARE Policy Manual was revised to mirror the

language of the Healthcare Order (the "June 11 Policy Manual"). The revised manual excludes

coverage for the "use of sex-hormones . . . to align an individual's physical appearance with an

identity that differs from his or her sex." TRICARE Policy Manual 6010.63-M, Ch. 7, § 1.2, sub.

2.4 (Change 35, June 11, 2025). The new exclusions apply to transgender adolescents and 18-

year-old adults. Attached as **Exhibit G** and incorporated by reference into this complaint is a true

and correct copy of the June 11 Policy Manual. Also attached as **Exhibit H** and incorporated by

reference into this complaint is a redline showing the changes made to the manual on June 11,

2025 (referred to on the TRICARE website as "Change 35").[20]

52.    By unilaterally adopting a categorical TRICARE exclusion for 18-year-old adults'

gender-transition care (the "TRICARE Exclusion"), the March 13 Memorandum, April 21

Additional Guidance, and June 11 Policy Manual reversed prior policy and practice, which for

years had permitted transgender adults to obtain TRICARE coverage for medically necessary

gender-transition medications.

53.    In addition, by categorically prohibiting MTFs from providing gender-transition

care to any transgender person regardless of age (the "MTF Care Ban"), the March 13

Memorandum, April 21 Additional Guidance, and May 9 Memorandum reversed prior policy

---

[20] The previous version of the TRICARE Policy Manual contained two sections related to gender dysphoria
treatment: (1) section 1.2 covered care for dates of service on or before June 30, 2022, and (2) section 1.3 covered
dates of service on or after July 1, 2022. The revisions made on June 11, 2025, known as "Change 35," removed the
section covering care for dates of service before June 30, 2022, leaving only a single section (the new Section 1.2)
covering dates of service on or after July 1, 2022. *Compare* Ex. A, *with* Ex. G.

and practice under which TRICARE beneficiaries could receive medically necessary gender-transition medications at MTFs on a space-available basis.

54.    DoD did not notify Plaintiffs or other TRICARE beneficiaries about these significant changes in benefits as required by 10 U.S.C. § 1097d.

55.    The MTF Care Ban unlawfully modified the scope of medical care provided at MTFs contrary to 10 U.S.C. § 1073d(f)(1), which states the Secretary of Defense "may not modify the scope of medical care provided at a military medical treatment facility" unless he first "submits to the Committees on Armed Services of the House of Representatives and the Senate a notification of the proposed modification in scope" and then waits 180 days. Defendants did not comply with these mandatory procedures.

## V.    **The Healthcare Order, TRICARE Exclusion, and MTF Care Ban are not authorized by statute.**

56.    In addition to parroting Section 6 of the Healthcare Order, DoD's March 13 Memorandum cited Section 708 of the Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025 (NDAA FY25), Pub. L. 118-159, December 23, 2024 (codified at 10 U.S.C. § 1079(a)(20)).

57.    The cited statute does not authorize the TRICARE Exclusion or the MTF Care Ban. Section 708 applies only to TRICARE coverage for minors "under the age of 18." 10 U.S.C. § 1079(a)(20). By contrast, the Healthcare Order and the TRICARE Exclusion categorically eliminated TRICARE coverage for gender transition medications for 18-year-old adults, and the MTF Care Ban prohibited gender transition care at MTFs for beneficiaries of all ages. Because Section 708 authorizes only a narrower limitation on TRICARE coverage, it does not provide statutory authority for these broader prohibitions.

58.     The MTF Care Ban also exceeded DoD's authority under Sections 1076 and 1077 of Title 10, which define the scope of care available to military families at MTFs. Section 1076 entitles dependents of service members to medical care at MTFs upon request, subject only to the availability of space, facilities, and staff capabilities. 10 U.S.C. § 1076(a)(1).

59.     Section 1077 authorizes MTFs to provide a broad range of services, including outpatient care, drugs, treatment of medical and surgical conditions, treatment of nervous, mental, and chronic conditions, and diagnostic services including laboratory and X-ray examinations. 10 U.S.C. § 1077(2)-(5), (9). Section 1077 also expressly identifies "the types of health care [that] may not be provided" at MTFs. The exclusions set forth in Section 1077 are narrower in scope than the statutory exclusions from TRICARE coverage, *see* 10 U.S.C. § 1079(a). Section 1077 does not include any exclusion for treatment of gender dysphoria.

60.     The MTF Care Ban categorically prohibited medical treatments that transgender dependents of military servicemembers were entitled to receive under Sections 1076 and 1077.

## VI.     DoD's care and coverage bans will harm Plaintiffs.

61.     Access to medication for gender dysphoria is critical to Plaintiffs' health and wellbeing.

### A.     Diana Doe

62.     Diana Doe is ▮▮▮▮▮▮▮▮ transgender woman whose father ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. Diana and her family receive coverage through TRICARE Prime.

63.     Diana has a diagnosis of gender dysphoria. She has undergone a medically supported transition to live as a woman. She has adopted a feminine name and is referred to with female pronouns.

64.      From a young age, Diana was uncomfortable with her birth sex. As her body began to change with puberty, her distress intensified, causing her mental health to suffer. As an

16

adolescent, with the support of her family, Diana established care with an endocrinologist at Walter Reed. After clinical evaluation by her providers, including a psychotherapist, and with the consent and support of her parents, Diana began taking female hormones to alleviate her gender dysphoria as an adolescent.

65.     Hormone therapy alleviated the distress Diana felt related to her gender dysphoria. After she started medical treatment, Diana's parents observed major improvements in her mental health and self-esteem. She grew more communicative with her parents, her school attendance improved, and her relationships with her family and her peers grew stronger.

66.     In April 2025, Diana's parents learned that her access to hormone therapy through the military health system would be cut off. Diana received her last prescription from her Walter Reed endocrinologist around that same time. They subsequently learned that Walter Reed would not provide any care related to Diana's gender dysphoria, other than mental health services. In addition to meaning Diana could no longer get prescriptions from her doctor, this meant Walter Reed would not conduct routine lab work to monitor her treatment.

67.     The MTF Care Ban disrupted Diana's established care relationship. Over time, Diana had developed significant trust with her Walter Reed endocrinologist, who had become familiar with her medical history, individual response to treatment, and family dynamics. Having to start over with a new provider, in a new healthcare system, created significant stress for Diana and her family as they worried about the continuity of care that has been effective for her.

68.     In May 2025, Diana's parents received a notice from Express Scripts that the preauthorization for Diana's hormone medications had been voided, meaning TRICARE would no longer cover those medications. However, they did not receive the required written notice from TRICARE of significant changes in benefits prior to losing coverage.

4120365

69.    The TRICARE Exclusion means that Diana's parents must pay out-of-pocket for her medical care, which is a significant expense.

70.    Hormone therapy is required medical treatment for Diana's medical condition. It is essential to her health and wellbeing. Ending hormone therapy would endanger her health.

**B.    <u>Parker Poe</u>**

71.    Parker Poe is ▮▮▮▮▮▮▮▮▮▮ transgender man. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Parker and his family receive healthcare coverage through TRICARE Prime.

72.    Parker has a diagnosis of gender dysphoria. He has undergone a medically supported transition to live as a man at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

73.    From a young age, Parker felt a sense of discomfort with his birth sex. His distress intensified as he grew older until it became clear to him that he was a boy. To understand how they could ensure Parker's health, his family sought medical guidance. Parker worked with a psychotherapist and began seeing a doctor at ▮▮▮▮ in relation to his gender dysphoria. Based on the advice of his military doctor, and with his parents' consent and support, Parker began taking testosterone as an adolescent to treat his gender dysphoria. The medication alleviated his symptoms and improved his mental health and quality of life. Parker continues to need testosterone in adulthood to treat his gender dysphoria.

74.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

75.     In or around March 2025, Parker's family learned from his doctor at ███ that TRICARE coverage for his testosterone would no longer be available, and that the doctor would no longer be able to treat Parker for gender dysphoria.

76.     Parker and his family subsequently received a notice from Express Scripts that the preauthorization for his testosterone was no longer valid. However, neither Parker nor his parents received the required written notice from TRICARE of significant changes in benefits prior to losing coverage.

77.     The MTF Care Ban and TRICARE Exclusion significantly disrupted Parker's care. He went months without the lab work needed to monitor his treatment. Additionally, without TRICARE coverage, Parker's prescription for testosterone ███ was too expensive to purchase out-of-pocket. As a result, ████████████ ████████████████████████████ ████████████████████████████ ██████████████ this process has resulted in unnecessary stress and created disruptions to his medical treatment.

78.     Parker's mother looked into a civilian doctor recommended for Parker, but learned it would be cost-prohibitive for him to become a patient there. Building a new patient-provider relationship at the ████████ where Parker is now obtaining testosterone prescriptions (paid for out-of-pocket) has been challenging for him, and the lack of continuity has led to confusion in his medical care. Losing access to the care he needed at ███ has left Parker with a deep sense of distrust in the healthcare system. Testosterone has allowed Parker to grow into a generally happy and healthy young adult man ████████████████. However, after the government's policy changes eliminated access to the medical treatment he

needed at ████ Parker experienced increased anxiety. He struggled to cope with a loss of self-esteem and had to start seeing a therapist again.

79.     Hormone therapy is required medical treatment for Parker's medical condition. It is essential to his health and wellbeing. Ending hormone therapy would endanger his health.

**C.     Brendan Boe**

80.     Plaintiff Brendan Boe is ████████ transgender man whose father ████████ ████████. Brendan and his family receive coverage through TRICARE.

81.     Brendan received a diagnosis of gender dysphoria. He has undergone a medically supported transition to live as a man. ████████████████████ ████████████████████████████████ ████████████████

82.     From a young age, Brendan began telling his family that he was a boy. He experienced significant discomfort and distress around his birth sex. Beginning in elementary school, he began living as a boy in all aspects of his life. As a result of Brendan's distress around his birth sex and to understand how to ensure his health, Brendan's family sought medical guidance. Brendan began seeing a psychiatrist and an endocrinologist at a military treatment facility.

83.     When Brendan was an adolescent, with the consent and support of his parents, his military doctors prescribed him puberty blockers, and later testosterone, as medically necessary treatment to support his transition to live as a boy.

84.     Brendan was consistently prescribed testosterone by military health providers into adulthood. Testosterone has been an effective course of treatment for Brendan.

85.    ████████████████████████████████████

████████████████████████████████████████████

██████████████████████

86.    As an adult, Brendan continues to need testosterone. Until May 2025, he had seen an endocrinologist at Walter Reed for many years, who prescribed this medication as part of his medically necessary care.

87.    In May 2025, Brendan and his family learned that as a result of DoD policy, Brendan could no longer go to Walter Reed for gender dysphoria treatment.

88.    The MTF Care Ban significantly disrupted Brendan's care. In order to continue accessing care, Brendan had to find a new provider outside of the military health system.

89.    Brendan had been enrolled in TRICARE Prime, under which he would have needed a series of referrals issued and periodically renewed in order to see a civilian doctor who could prescribe him testosterone and monitor his care. His family worried that this additional bureaucracy could further delay or prevent treatment, so Brendan switched his enrollment to TRICARE Select to avoid this complicated referral system. As a result, he lost access to his primary care provider at Walter Reed, and his family has incurred higher out-of-pocket costs for his healthcare.

90.    The sudden loss of care created significant stress for Brendan and his family and was harmful to his treatment. TRICARE initially provided a referral to an endocrinologist in a specialty clinic that could not treat him, which delayed him from seeing a new doctor, obtaining routine lab work to monitor his treatment, and making necessary adjustments to his prescription. Brendan's mother had to work for weeks to get him an appointment with an appropriate provider and barely managed to do so before Brendan had to return to ██████ another state. This gap

between providers and the uncertainty it created was distressing for Brendan and his family, as he had no additional refills left on his prescription by that point.

91.     The DoD policy disrupted continuity of care and Brendan's yearslong relationship with the doctor he trusted. He has not been able to access the timely, individualized medical care and advice  to which he was accustomed at Walter Reed. His new provider does not have the same understanding of his medical history as his doctor at Walter Reed.

92.     Additionally, filling Brendan's prescription at a civilian pharmacy now requires co-pays, an expense that he and his family did not have to bear when he could fill his prescription through MTF pharmacies at no cost.

93.     Hormone therapy is required medical treatment for Brendan's medical condition. It is essential to his health and wellbeing. Ending hormone therapy would endanger his health.

## CLAIMS FOR RELIEF

### COUNT I

**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Agency Action Taken Without Observance of Procedure Required by Law**

94.     All allegations above are incorporated herein by reference.

95.     The TRICARE Exclusion and MTF Care Ban are final agency actions. They represent the consummation of the agency's decision-making process. Legal consequences flow directly from these agency actions: the MTF Care Ban deprives Plaintiffs and other TRICARE beneficiaries of medically necessary healthcare at MTFs, and the TRICARE Exclusion denies 18-year-old Plaintiffs TRICARE coverage for that care. These agency actions are treated as binding by MTFs and TRICARE.

96.     The APA requires courts to set aside and vacate agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

97.     Under the APA, substantive rules promulgated by an agency must undergo notice-and-comment rulemaking procedures to allow the public and affected parties the opportunity to weigh in on changes to agency policy. 5 U.S.C. § 553.

98.     The TRICARE Exclusion and the MTF Care Ban are substantive rules with the force and effect of law and are therefore subject to notice-and-comment rulemaking procedures. They revoked pre-existing policies on the scope of TRICARE coverage and MTF Care, and they instituted new binding rules that affirmatively change the rights of TRICARE beneficiaries and the obligations of Defendants. They also effectively modified the comprehensive statutes and regulations governing TRICARE benefits, which set forth coverage exclusions and provide that TRICARE beneficiaries are eligible for MTF care on a space-available basis.

99.     Defendants did not comply with the notice-and-comment rulemaking procedures required for all new substantive rules, and thus impermissibly promulgated a new rule in violation of the APA.

100.    In addition, Defendants did not follow the beneficiary-notice requirements set forth in 10 U.S.C. § 1097d before making a significant change to benefits provided by the TRICARE program.

101.    The MTF care ban also modified the scope of medical care provided at MTFs without observance of the notice procedures and 180-day waiting period required by 10 U.S.C. § 1073d(f)(1).

102.    Plaintiffs are harmed by these unlawful acts.

4120365

## COUNT II

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Agency Action Not in Accordance with Law and in Excess of Statutory Authority**
**Arbitrary and Capricious Agency Action**
**Asserted by** ███████████████████████ **Only**

103.    All allegations above are incorporated herein by reference.

104.    The APA requires courts to set aside and vacate agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

105.    The traditional tools of statutory interpretation confirm that DoD's TRICARE Exclusion exceeded the scope of and is contrary to the clear meaning of Section 708 of NDAA FY25. Congress explicitly limited the TRICARE exclusion set forth in Section 708 to certain gender dysphoria treatments for individuals "under the age of 18." 10 U.S.C. § 1079(a)(20). DoD attempted to rewrite the statute by adopting an exclusion for gender dysphoria treatments for anyone "under 19 years of age."

106.    Because DoD's TRICARE Exclusion contravenes the plain text of Section 708, it is not in accordance with law and exceeds DoD's lawful authority to implement the statute.

107.    DoD's TRICARE Exclusion is also arbitrary and capricious because it denies TRICARE coverage for transgender 18-year-olds, who are not subject to the coverage exclusion set forth in Section 708 of NDAA FY25. DoD's decision to revoke coverage and disrupt care for these adults is a total reversal in policy that is unsupported by any citation or explanation. The decision is also contrary to medical evidence showing the benefits of providing medically necessary gender transition care to adults, and it ignored important factors, including medical necessity, reliance interests, and effects on military readiness.

24

4120365

108.    DoD's TRICARE Exclusion is not the product of reasoned decision-making and is arbitrary and capricious. It was adopted at least in part because of the federal government's broader policy of eliminating so-called "gender ideology" by curtailing access to medically necessary gender-transition care and denying equal rights and benefits to transgender people. Government action based on such animus and discriminatory purpose is inherently arbitrary and capricious.

109.    Plaintiffs are harmed by these unlawful acts.

## COUNT III

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Agency Action in Excess of Statutory Authority**
**Arbitrary and Capricious Agency Action**

110.    All allegations above are incorporated herein by reference.

111.    The MTF Care Ban falls outside the scope of the authority delegated to DoD under Title 10. By categorically prohibiting treatment for gender dysphoria at MTFs for all TRICARE beneficiaries without consideration of the relevant statutory factors, *see* 10 U.S.C. §§ 1076–77, the MTF Care Ban imposed a restriction on MTF access that Congress did not enact and exceeded DoD's statutory authority.

112.    In addition, the MTF Care Ban's denial of care to all adult TRICARE beneficiaries is arbitrary and capricious. It was a total reversal in policy that was not acknowledged or explained by the agency. In adopting the MTF Care Ban, DoD did not account for the statutory factors governing military dependents' access to MTFs and did not consider other important factors, including: medical necessity, medical evidence showing the benefits of providing medically necessary gender transition care to adults in clinically appropriate circumstances, evidence showing the harms of denying or terminating medically necessary

25

gender transition care, the reliance interests of military families who had established care at MTFs, or the effect of family medical care disruptions on military readiness.

113.    In addition, with respect to 18-year-old TRICARE beneficiaries, the MTF Care Ban is arbitrary and capricious because it resulted from an executive attempt to rewrite the terms of Section 708 (codified at 10 U.S.C. § 1079(a)(20)).

114.    With respect to TRICARE beneficiaries 19 years of age and older, the MTF Care Ban is arbitrary and capricious because the explanation set forth in the May 9 Memorandum was not rationally connected to the outcome for two reasons.

115.    First, the May 9 Memorandum purported to justify the MTF Care Ban by referencing court decisions and DoD policies affecting transgender servicemembers. But those authorities do not justify a ban on MTF care for dependents of servicemembers, who are a distinct group subject to different laws and policies.

116.    Second, the May 9 Memorandum acknowledged that gender-transition medications for adults aged 19 and over are covered treatments under TRICARE—implicitly admitting that these treatments are medically necessary to treat gender dysphoria in appropriate circumstances. DoD provided no rational explanation for terminating gender-transition medications at MTFs while continuing to provide coverage for the same medications under TRICARE.

117.    As to all military dependents, the MTF Care Ban is not the product of reasoned decision-making. DoD implemented the ban because of the federal government's broader policy of eliminating so-called "gender ideology" by curtailing access to medically necessary gender-transition care and denying equal rights and benefits to transgender people. Government action based on such animus and discriminatory purpose is inherently arbitrary and capricious.

4120365

118.    Plaintiffs are harmed by these unlawful acts.

## COUNT IV

### Relief under the Declaratory Judgment Act, 28 U.S.C. § 2201

119.    All allegations above are incorporated herein by reference.

120.    The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

121.    This case presents an actual controversy. DoD has invoked Section 708 of NDAA FY25 to deprive Plaintiffs of medically necessary healthcare at MTFs and to deny TRICARE coverage for medically necessary care delivered through the private sector.

122.    Through this Complaint, Plaintiffs have filed an appropriate pleading to have their rights declared. The Court can resolve this controversy by declaring that: (a) Section 708 of NDAA FY25 does not authorize MTFs to deny adult dependents of servicemembers medically necessary treatment for gender dysphoria, including hormone therapy, bloodwork, and monitoring; (b) Section 708 of NDAA FY25 does not authorize DoD to deny TRICARE coverage for adult dependents' hormone medications and related bloodwork and appointments that are medically necessary to treat their gender dysphoria; (c) the TRICARE Exclusion and MTF Care Ban are arbitrary and capricious agency actions that were taken without observance of procedures required by law and in excess of DoD's statutory authority; and (d) DoD therefore lacks authority to deny adult dependents MTF care or TRICARE coverage for medically necessary hormone medications to treat their gender dysphoria.

4120365

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief:

(1) Issue a judgment under 28 U.S.C. §§ 2201–02 declaring that Section 708 of NDAA FY25 does not prohibit TRICARE from covering adult dependents' medically necessary hormone medications and does not prohibit MTFs from providing such medications and related medical care;

(2) Issue a judgment under 28 U.S.C. §§ 2201–02 declaring that the TRICARE Exclusion and MTF Care Ban violate the Administrative Procedure Act;

(3) Hold unlawful and set aside the March 13 Memorandum, April 21 Additional Guidance, May 9 Memorandum, and June 11 Policy Manual under the Administrative Procedure Act;

(4) Enter a permanent injunction prohibiting Defendants and their officers, employees, servants, agents, appointees, and successors from enforcing Section 6 of the Healthcare Order, the March 13 Memorandum, April 21 Additional Guidance, May 9 Memorandum, and the June 11 Policy Manual with respect to adult dependents;

(5) Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and other applicable laws; and

(6) Grant such other and further relief as the Court deems just and proper.

4120365

Respectfully submitted,


BROWN GOLDSTEIN & LEVY LLP


Dated: Februrary 18, 2026       By:   */s/ Eve Hill*

EVE HILL (Bar No. 19938)
120 East Baltimore Street, Suite 2500
Baltimore, MD  21202
Telephone: (410) 962-1030
Facsimile: (410) 385-0869
ehill@browngold.com



KEKER, VAN NEST & PETERS LLP


By:   */s/ Sharif E. Jacob*

SHARIF E. JACOB (*Admitted Pro Hac Vice*)
RYAN K. WONG (*Admitted Pro Hac Vice*)
EMILY A. HASSELBERG (*Admitted Pro Hac Vice*)
SARA R. FITZPATRICK (*Admitted Pro Hac Vice*)
LIAM BROWN (*Admitted Pro Hac Vice*)
JULIE A. HUNTER (*Admitted Pro Hac Vice*)
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
sjacob@keker.com
rwong@keker.com
sfitzpatrick@keker.com
liambrown@keker.com
jhunter@keker.com

29

4120365

GLBTQ LEGAL ADVOCATES & DEFENDERS


By:  */s/ Jennifer Levi*
JENNIFER LEVI (*Admitted Pro Hac Vice*)
SARAH AUSTIN (*Admitted Pro Hac Vice*)
HANNAH HUSSEY (*Admitted Pro Hac Vice*)
ELIZABETH RODRIGUEZ-ROSS
(*Admitted Pro Hac Vice*)
18 Tremont Street, Suite 950
Boston, MA  02108
Telephone: (617) 778-6961
Facsimile: (617) 426-3594
jlevi@gladlaw.org
saustin@gladlaw.org
hhussey@gladlaw.org
erodriguezross@gladlaw.org


NATIONAL CENTER FOR LGBTQ RIGHTS


By:  */s/ Shannon Minter*
SHANNON MINTER (*Admitted Pro Hac Vice*)
CHRISTOPHER F. STOLL
(*Admitted Pro Hac Vice*)
1401 21st Street, #11548
Sacramento, CA  95811
Telephone: (415) 365-1320
Facsimile: (415) 392-8442
sminter@nclrights.org
cstoll@nclrights.org

Attorneys for Plaintiffs
DIANA DOE, PARKER POE, and BRENDAN
BOE

4120365