UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |
|---|---|
| DIANA DOE, PARKER POE and BRENDAN BOE,<br><br>        *Plaintiffs,*<br><br>    v.<br><br>DEPARTMENT OF DEFENSE; PETE HEGSETH, in his official capacity as Secretary of Defense; ANTHONY J. TATA, in his official capacity as the Under Secretary of Defense for Personnel and Readiness; KEITH BASS, in his official capacity as Assistant Secretary of Defense for Health Affairs; DEFENSE HEALTH AGENCY; and DARIN K. VIA, in his official capacity as Director of the Defense Health Agency,<br><br>        *Defendants.* | Civil Action No. 8:25-cv-02947-DLB<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD** |

**INTRODUCTION**

Plaintiffs move to supplement the administrative record in this Administrative Procedure Act (APA) challenge to the Department of Defense's abrupt reversal of a decade-old policy guaranteeing medically necessary care to adults with gender dysphoria. Through a series of directives issued between March and June 2025—the March 13 Memorandum (Mar. 13, 2025), the April 21 Additional Guidance (Apr. 21, 2025), the May 9 Memorandum (May 9, 2025), and the TRICARE Policy Manual (June 11, 2025)—the Department of Defense (DOD) and Defense Health Agency (DHA) (collectively, the "Government") prohibited military treatment facilities from providing hormone therapy to adults with gender dysphoria and excluded that medically necessary treatment from TRICARE coverage. First Amended Complaint (FAC) ¶¶ 48–51, ECF No. 55; FAC Exs. D–G. The directives reach legal adults, including by stripping TRICARE coverage of hormone therapy from eighteen-year-olds. And they are contrary to the DOD's own 2016 regulation removing the "categorical exclusion on treatment of gender dysphoria" and authorizing "coverage of all non-surgical medically necessary and appropriate care in the treatment of gender dysphoria, consistent with the program requirements applicable for treatment of all mental or physical illnesses." TRICARE; Mental Health and Substance Use Disorder Treatment, 81 Fed. Reg. 61068 (Sept. 2, 2016).[1]

Following the filing of the Administrative Record (AR) on May 11, 2026, *see* ECF No. 72, Plaintiffs move to supplement the record with the expert declaration of Dan H. Karasic, M.D., which explains technical concepts of evidence-based medicine — including the meaning

---

[1] In the final rule, DOD stated that it was "no longer justifiable to categorically exclude and *not cover* currently accepted medically and psychologically necessary treatments for gender dysphoria (such as …hormone replacement therapy)[.]" TRICARE; Mental Health and Substance Use Disorder Treatment, 81 Fed. Reg. 61068, 61071 (Sept. 2, 2016), https://www.govinfo.gov/content/pkg/FR-2016-09-02/pdf/2016-21125.pdf (emphasis added).

of "low to moderate" quality evidence, a term of art the record uses but never defines — and identifies decades of relevant research the agency failed to consider.[2]

The AR consists largely of scientific research articles, DOE_AR_121–685, and an undated Literature Review that draws conclusions about the "level of evidence for gender-affirming treatments for gender dysphoria," using terminology referencing various research study design methodologies. DOE_AR_111–20. It is quintessentially the type of administrative record for which supplementation is justified. First, the AR contains technical information, scientific terms of art, concepts of research methodology, and assertions about the state of scientific evidence. The Karasic Declaration explains these technical terms and concepts. Second, as the Karasic Declaration discusses, any reliance on the Literature Review's conclusions to reject or prohibit hormone therapy would rest on a misinterpretation and misapplication of key principles of evidence-based medicine. Dr. Karasic's explanation of the correct understanding and application of those principles provides critical scientific context for the Court to weigh Plaintiffs' argument that the directives are arbitrary and capricious. Third, the Literature Review addresses only a small slice of the relevant body of literature on the efficacy of hormone therapy as treatment for gender dysphoria, ignoring key indicia of research reliability — including the longevity (here, decades) and consistency of findings demonstrating the benefits of hormone therapy.

---

[2] Dr. Karasic is Professor Emeritus of Psychiatry at the University of California – San Francisco, has extensive experience in the development of research and treatment protocols related to transgender health and in peer review of publications focusing on transgender health, has numerous publications on the diagnosis and treatment of gender dysphoria, and has diagnosed, evaluated, and treated thousands of transgender patients over the course of 30 years. Karasic Decl. ¶¶ 1, 3, 6–7. He is recognized, and has been qualified by numerous courts, as an expert. *Id.* at ¶ 14.

**ARGUMENT**

**A.      Legal Standard**

Although review of an agency decision is usually confined to the administrative record, "[t]here may be circumstances to justify expanding the [administrative] record[.]" *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 188 n.4 (4th Cir. 2005) (citing *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1336 (4th Cir. 1995)).[3] Circumstances for expanding the record with extra-record evidence include "when that evidence '(1) explains technical information or agency action not adequately explained in [the] record" or "(2) shows an agency failed to consider relevant evidence[.]" *Sierra Club v. Nat'l Marine Fisheries Serv.*, 711 F. Supp. 3d 522, 541 (D. Md. 2024) (quoting *Hodges v. Abraham*, 253 F. Supp. 2d 846, 855 (D.S.C. 2002)). Courts regularly permit supplementation of the record with expert declarations under these circumstances. *Id.* at 545 (granting request to supplement with an expert declaration where the court had "no trouble" finding relevant portion "admissible under the exception for evidence that clarifies technical information" and noted that courts "regularly admitted declarations" under the second exception). *See also Tafas v. Dudas*, 511 F. Supp. 2d 652, 662–63 (E.D. Va. 2007) (finding external material relied upon in an expert declaration "appropriate for the purpose of providing explanatory and background information"); *Ohio Valley Envtl. Coal. v. United States Army Corps of Eng'rs*, No. 3:05-0784, 2006 U.S. Dist. LEXIS 114643, at *6-7 (S.D. W. Va. Mar. 31, 2006) (permitting supplementation of the record "to offer explanations of scientific or technical terms or complex subject matter" under this "well-recognized" exception); *Ctr. for*

---

[3] Although agencies are generally entitled to a presumption of regularity in compiling the administrative record, that presumption "is not to shield [agency] action from a thorough, probing, in-depth review," and a sufficient showing can justify looking beyond the agency's own certification. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

*Biological Diversity v. Haaland*, No. 2:23-CV-58-BO-BM, 2024 U.S. Dist. LEXIS 189326, at *4 (E.D.N.C. Oct. 16, 2024) (permitting supplementation with published studies to "help the Court to understand the subject matter, and thus properly make a determination as to whether the challenged action was arbitrary and capricious because it did not take into account all relevant factors").

**B.    Background Relevant to the Need for Supplementation**

The Literature Review purports to assess the levels of evidence supporting gender transition treatments, specifically with regard to hormone therapy, behavioral health, and surgical interventions. DOE_AR_111–20. It discusses various types of research study design and briefly references the relationship between study methodology and the "levels of evidence hierarchy[.]" DOE_AR_111. In its section on hormone therapy, the Literature Review cites five studies regarding the psychological benefits of hormone therapy, noting the quality of evidence in each. DOE_AR_113–14. Each of the studies cited shows that hormone therapy provides psychological benefits for people with gender dysphoria. *Id.* However, the Literature Review concludes that the strength of the evidence for each type of gender transition treatment, including hormone therapy, is "low to moderate." DOE_AR_111–14. The Literature Review does not define or explain the meaning or significance of the term "low to moderate" evidence, which has a well-established technical usage in the field of evidence-based medicine, nor does it contextualize the meaning of that level of evidence with regard to other commonly accepted medical interventions.

Dr. Karasic's declaration explains that prohibiting or rejecting hormone therapy as a treatment for gender dysphoria based on the Literature Review would reflect a "misunderstanding and misapplication" of the technical concepts referenced in the Literature

5

Review.[4] Karasic Decl. ¶ 28. As Dr. Karasic makes clear, the Literature Review's conclusions about evidence quality do not mean that the evidence supporting hormone therapy is unreliable, but rather speak to the research methodology used. Karasic Decl. ¶ 29. The declaration discusses different study designs and defines key concepts related to the evaluation of evidence quality through the Grading of Recommendations Assessment, Development and Evaluation (GRADE) system. Karasic Decl. ¶ 29-36. Under this system, the designation of evidence as "low-quality" is a term of art that does not carry the colloquial meaning of "poor quality." Karasic Decl. ¶ 29. Medical studies classified as "high quality" under the GRADE system are typically randomized control trials – a methodology that is neither possible nor ethical[5] to use for the study of many areas of medicine, including hormone therapy. Karasic Decl. ¶ 32. As a result, the medical field relies largely on observational studies, and it is the norm for accepted treatments to be based on "low" or "very low" quality evidence. Karasic Decl. ¶ 34. Indeed, the declaration explains that very few medical interventions are backed by "high-quality" evidence under the GRADE system, citing one study showing that, out of more than 1,500 medical interventions evaluated, only 5.6 percent had high-quality evidence supporting their benefits—and *zero* percent of endocrine interventions did. Karasic Decl. ¶ 34–36.

The declaration additionally notes the Literature Review's mischaracterization of the medical evidence supporting the efficacy of hormone therapy as an "emerging" area of research.

---

[4] The declaration also provides brief but important background information on gender dysphoria and its treatment that is necessary for the Court to understand the diagnosis and medical treatments discussed in the Literature Review. Karasic Decl. ¶¶ 15–27.

[5] As Dr. Karasic explains, randomized control trials are not feasible for medical interventions that are readily apparent to study participants, such as hormone therapy. Karasic Decl. ¶ 32. Nor are randomized control trials ethically permitted when researchers know at the outset that an intervention is beneficial, as is the case for hormone therapy used to treat gender dysphoria. *Id.*

DOE_AR_111, Karasic Decl. ¶ 37. It explains that to the contrary, there is a substantial and longstanding body of medical literature going back decades that demonstrates the benefit of hormone therapy for treating gender dysphoria. *Id.* ¶¶ 37, 44–55. This matters, as the declaration makes clear, because the "consistency of findings over a long duration provides strong indicia of reliability" in medical research. Karasic Decl. ¶57. Dr. Karasic points out that the Literature Review left out decades of research showing the efficacy of hormone therapy in treating gender dysphoria. Karasic Decl. ¶¶ 37, 44. Examples of studies omitted by the Literature Review and discussed in the declaration range from multiple recent systematic reviews showing an association between hormone therapy and improvements in mental health, to a systematic review of studies dating back to 1966 and another systemic review of studies dating back to 1991 (which consistently demonstrated the benefit of hormone therapy as treatment for gender dysphoria). Karasic Decl. ¶¶ 45–55. Finally, the declaration also reviews the endorsement of medical interventions for gender dysphoria, such as hormone therapy, by the country's major medical associations, such as the American Medical Association, the American Psychiatric Association, American Psychological Association, American College of Obstetricians and Gynecologists, and American Academy of Family Physicians. Karasic Decl. ¶ 24.

C.      **The Karasic declaration is necessary to correctly understand technical terminology, the strength of medical evidence for gender transition treatment, and relevant indicia of reliability when reviewing such evidence**

The Court should grant Plaintiffs' motion to supplement the administrative record with the expert declaration of Dr. Dan A. Karasic, which has been submitted as **Exhibit A** to this motion. Dr. Karasic's declaration, and the accompanying exhibits, are necessary to explain technical information not adequately explained in the record, particularly the meaning of low-to-moderate-quality evidence, and to show that the agency failed to consider relevant evidence. *See Sierra Club*, 711 F. Supp. 3d at 541.

7

Dr. Karasic's declaration should be admitted to "explain or clarify technical terms or other difficult subject matter included in the record." *Tafas*, 511 F. Supp. 2d at 662–63 (finding use of declaration "appropriate" in part based on the use of "terms used uniquely in the patent context"). The record contains references to specialized evidentiary frameworks, statistical methodologies, and clinical terminology—including evidence quality ratings drawn from the GRADE system. *See* DOE_AR_111–20, 346–476. The meaning, application, and implications of the GRADE ratings are neither self-evident nor explained sufficiently in the AR. Accordingly, Dr. Karasic's declaration provides the interpretative framework necessary to understand the evidence already in the record. Of particular significance, Dr. Karasic's declaration explains that the phrase "low to moderate" quality of evidence is a term of art used in the GRADE system and medical research. Karasic Decl. ¶ 29. Because the Literature Review uses a term whose technical meaning differs from its colloquial meaning, it is especially important to have an expert define and clarify that term for the Court. *See Sierra Club* at 542 (highlighting "the opacity of the relevant vocabulary and methods" in finding relevant portion of declaration admissible).

In a similar vein, the declaration explains the role that different research methodologies and different levels of evidence quality play in medicine, drawing on studies showing that few medical interventions are supported by high-quality evidence and that most are supported by low- or very-low-quality evidence. Karasic Decl. ¶¶ 29–36. This background is critical to understanding the Literature Review's conclusions regarding the strength of evidence on behavioral health, hormone, and surgical interventions used in gender transition treatment. Finally, the declaration explains and contextualizes specialized concepts present in the literature reviewed by the Government, such as research design, data limitations in research with subpopulations, complex interventions, and sample size, as well as the concept of treatment

risks. Karasic Decl. ¶¶ 30–33, 38–43, 56, 58–60. These are precisely the sort of "key terms" and "complex subject matter" that necessitate supplementation of the record. *Sierra Club*, 711 F. Supp. 3d at 542; *Ohio Valley Envtl. Coal.*, 2006 U.S. Dist. LEXIS 114643 at *6.

Dr. Karasic's declaration and accompanying studies are also necessary to "show[] an agency failed to consider relevant evidence." *Sierra Club* at 541. "Courts have regularly admitted declarations like this one for that purpose." *Id.* at 542. *See also Defs. of Wildlife & Nat'l Wildlife Refuge Ass'n v. N.C. DOT*, No. 2:11-CV-35-FL, 2012 U.S. Dist. LEXIS 205454, at *10-11 (E.D.N.C. June 6, 2012) (permitting supplementation where it appeared that the plaintiffs' exhibits "*may* augment the technical information available to the court and *may* raise issues as to whether defendants considered all relevant evidence") (emphasis in original). The declaration's discussion of the substantial body of evidence that supports hormone therapy as a treatment for gender dysphoria goes to the longevity and consistency of research findings, factors that Dr. Karasic explains are indicia of reliability yet which the Government failed to consider. Karasic Decl. ¶¶ 44–57. Specifically, Dr. Karasic's declaration presents peer-reviewed studies and systematic reviews of research spanning many decades that demonstrate the benefits of hormone treatment for patients with gender dysphoria. *Id.* at 45–55. It notes one of those studies also examines the impact of delayed access to hormones—finding such delays are associated with worsening gender dysphoria and increased depression and anxiety. Karasic Decl. ¶ 46; Ex. 14. These kinds of harms are among those that the Government failed to properly weigh. And although the record includes the standards of care issued by the Endocrine Society, the Government failed to consider the position of the country's major medical associations regarding hormone therapy as an intervention for gender dysphoria in adults—relevant evidence that Dr. Karasic's declaration describes. Karasic Decl. ¶ 24. The significance of this omitted evidence is

underscored by the Department's own prior reliance on it: the longstanding research demonstrating the efficacy of hormone therapy formed the basis for DOD's 2016 regulation removing the categorical exclusion on treatment of gender dysphoria. 81 Fed. Reg. 61068. *See Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 705 (4th Cir. 2019) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy."). Dr. Karasic's declaration thus helps the Court assess whether the agency ignored the very evidence that supported its prior, contrary policy.

As with the declaration permitted and considered by the court in *Sierra Club*, Dr. Karasic's declaration does *not* attack the scientific literature that is included in the AR. Instead, his declaration "help[s] the Court assess whether the government failed to consider something it should have." *Sierra Club*, 711 F. Supp. 3d at 544. This is particularly important given the Government's characterization of transgender health as an "emerging" area of research with limitations that make it "difficult to draw clear conclusions." DOE_AR_111. Dr. Karasic's expertise is thus vital to help the Court understand what relevant evidence the Government failed to consider. The Court should therefore grant Plaintiffs' request to supplement the record with Dr. Karasic's expert declaration.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion to supplement the administrative record with Dr. Karasic's expert declaration.

Respectfully submitted,

BROWN GOLDSTEIN & LEVY LLP


Dated:  July 10, 2026          By:   */s/ Eve Hill*
                                     EVE HILL (Bar No. 19938)
                                     120 East Baltimore Street, Suite 2500
                                     Baltimore, MD  21202
                                     Telephone: (410) 962-1030
                                     Facsimile: (410) 385-0869
                                     ehill@browngold.com


                               KEKER, VAN NEST & PETERS LLP


                               By:   */s/ Sharif E. Jacob*
                                     SHARIF E. JACOB (Admitted Pro Hac Vice)
                                     RYAN K. WONG (Admitted Pro Hac Vice)
                                     EMILY A. HASSELBERG (Admitted Pro Hac
                                     Vice)
                                     SARA R. FITZPATRICK (Admitted Pro Hac
                                     Vice)
                                     LIAM BROWN (Admitted Pro Hac Vice)
                                     JULIE A. HUNTER (Admitted Pro Hac Vice)
                                     ALEXANDER LOPEZ (Admitted Pro Hac Vice)
                                     633 Battery Street
                                     San Francisco, CA  94111
                                     Telephone: (415) 391-5400
                                     Facsimile: (415) 397-7188
                                     sjacob@keker.com
                                     rwong@keker.com
                                     sfitzpatrick@keker.com
                                     liambrown@keker.com
                                     jhunter@keker.com

11

GLBTQ LEGAL ADVOCATES & DEFENDERS

By: */s/ Jennifer Levi*

JENNIFER LEVI (Admitted Pro Hac Vice)
SARAH AUSTIN (Admitted Pro Hac Vice)
HANNAH HUSSEY (Admitted Pro Hac Vice)
ELIZABETH RODRIGUEZ-ROSS
(Admitted Pro Hac Vice)
18 Tremont Street, Suite 950
Boston, MA  02108
Telephone: (617) 778-6961
Facsimile: (617) 426-3594
jlevi@gladlaw.org
saustin@gladlaw.org
hhussey@gladlaw.org
erodriguezross@gladlaw.org

NATIONAL CENTER FOR LGBTQ RIGHTS

By: */s/ Shannon Minter*

SHANNON MINTER (Admitted Pro Hac Vice)
CHRISTOPHER F. STOLL
(Admitted Pro Hac Vice)
1401 21st Street, #11548
Sacramento, CA  95811
Telephone: (415) 365-1320
Facsimile: (415) 392-8442
sminter@nclrights.org
cstoll@nclrights.org

Attorneys for Plaintiffs
DIANA DOE, PARKER POE, and BRENDAN
BOE

12